**UNITED STATES, Appellee,**

v.

**Cyril E. VAN HORN, III, Electronics Technician Third Class, U.S. Navy, Appellant.**

No. 56,960.

NMCM 86–0502.

U.S. Court of Military Appeals.

Sept. 26, 1988.

For Appellant: *Lieutenant Deborah D. Sorkin,* JAGC, USNR (argued); *Commander J.A. Williams,* JAGC, USN (on brief); *Lieutenant Commander Alvin L. McDonald,* JAGC, USN and *Lieutenant Timothy D. Persons,* JAGC, USNR.

For Appellee: *Lieutenant Scott A. Hagen,* JAGC, USNR (argued); *Captain Wendell A. Kjos,* JAGC, USN (on brief); *Lieutenant Georjan D. Overman,* JAGC, USNR.

*Opinion of the Court*

SULLIVAN, Judge:

In 1985 appellant was tried by a special court-martial composed of a military judge alone at the Naval Submarine Base New London, Groton, Connecticut. Contrary to his pleas, he was found guilty of wrongful use of cocaine, in violation of Article 112a, Uniform Code of Military Justice, 10 U.S.C. § 912a. He was sentenced to a bad-conduct discharge, confinement for 3 months, forfeiture of $400.00 pay per month for 3 months, and reduction to pay grade E–1. The convening authority approved the sentence, and the Court of Military Review affirmed (one judge dissenting).

This Court granted review of the following issue:

WHETHER THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S REQUEST FOR AN EXPERT WITNESS ON THE ISSUE OF PROPER URINALYSIS TESTING.

We agree with Judge Gladis' dissent below and hold that the military judge erred in denying this particular request for Dr. Pitts. *See generally Caldwell v. Mississippi,* 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985); *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

Judge Gladis outlined the general context giving rise to the granted issue, as follows:

The Government sought to prove the accused's wrongful use of cocaine by evidence consisting of the laboratory results of a urinalysis and expert testimony of a Government witness explaining them. The accused denied that he had used cocaine. The laboratory results showed that the accused's urine tested positive

for the presence of cocaine. The defense proffers of the expected testimony of the requested defense expert indicated that, although he agreed that the laboratory results indicated the presence of cocaine, he questioned the accuracy of the tests because of discrepancies in the testing procedures and would interpret the results as negative. The military judge denied the defense motion to produce the requested defense expert at Government expense, finding that, although the testimony of the defense expert was relevant, it was not necessary and there was an adequate substitute in the expected testimony of the Government expert. The defense expert did not testify.

Unpub. op. at 2.

The defense request for this witness states:

Subj: REQUEST FOR EMPLOYMENT OF EXPERT WITNESS ICO *U.S. v. ET3 CYRIL E. VANHORN USN, 144–70–5804*

Ref: (a) Article 46, UCMJ

(b) R.C.M. 703, MCM (1984)

1. In accordance with references (a) and (b), the Defense respectfully requests that Dr. Lucius Loring Pitts, II, Ph.D., of 2787 Birchwood Drive, Orange Park, Florida 32073, be employed at government expense for purposes of testifying for the Defense in the subject case. Dr. PITTS is currently self-employed as a Toxicology Consultant. He is retired from the United States Navy as a Lieutenant Commander in the Medical Services Corps. His job in 1983 and 1984 was that of Technical Director at the Naval Drug Screening Laboratory in Jacksonville, Florida. The lab at Jacksonville employed the same standard operating procedures which are currently utilized at the lab in Great Lakes, Illinois.

2. Dr. PITTS has reviewed all lab documentation in this case which has been provided to the Defense by the Government. If called by the defense, Dr. PITTS would testify substantially as follows:

a. That Naval Drug Screening Laboratory, Great Lakes, IL did not follow the standard operating procedures for naval drug testing labs by failing to set the sensitivity threshold properly with respect to the gas liquid chromatography/mass spectrometry tests conducted on ET3 VANHORN's urine sample. More precisely, Dr. PITTS will testify that lab personnel did not inject enough of the sample to achieve the proper cut-off point of 250ng/ml. Instead, the threshold was set at a lower 150ng standard. Consequently, lab personnel ended up using the raw area to determine sensitivity while using the tangent area to determine the amount. Dr. PITTS will testify that, in using this threshold, the accuracy of the tests conducted was reduced, rendering the quantitative measurement of the metabolites in ET3 VANHORN's sample suspect.

b. That Naval Drug Screening Laboratory, Great Lakes, IL did not follow the standard operating procedures in that lab personnel failed to investigate the cause of noise registering on the 303 channel during the GC/MS tests conducted on ET3 VANHORN's urine sample. More precisely, Dr. PITTS will testify that normally readings on this particular channel do not exceed 5 whereas in the tests conducted on ET3 VANHORN's sample the readings exceeded 15. He will further testify that a noisy 303 channel indicates either that an adequate quantity or quality of gas is not being used, or that the mass spectrometry source is dirty. In either case, Dr. PITTS will testify that such error reduces the accuracy of the tests employed and affects the quantitative measurement of metabolites in the sample.

c. That, together with the fact that ET3 VANHORN's sample was retested as falling below even a 200ng standard, these defects call into question the reliability of the results of the urinalysis conducted on ET3 VANHORN's sample by Naval Drug Screening Laboratory, Great Lakes, Illinois.

4. Dr. PITTS may be made available by the Defense for the purpose of testifying on a motion to suppress/dismiss. Dr. PITTS fee is $500 per day plus expenses. The Defense would estimate that his testimony would last two days.

The military judge denied this request and made, *inter alia*, the following findings of fact and conclusions of law:

\* \* \* \* \* \*

On or after 6 June 1985, a urine specimen purporting to be that of the accused was tested by a civilian laboratory and found it contained less than 200 nanograms per milliliter of cocaine metabolite.

Ninth, the testimony of Dr. Pitts does not disprove the presence of cocaine metabolite from the tested specimen, only the concentration thereof.

Now with respect to the defense request for Dr. Pitts, the court concludes the following:

First, there is no evidence before this court from which to conclude that the procedures of the Standard Operating Procedure were violated. The utilization of the raw area count in paragraph C of Section XVI does not appear to violate the provisions of the Standard Operating Procedure as that is the sensitivity calibration versus the quantitative calibration.

Further, it appears that the standard requirements of D.3.e. relative to the comparisons of the 303 mass ion peak and the 226 mass ion peak have been complied with. The evidence appears to support the conclusion that the procedures of Section XVI of the Standard Operating Procedures manual were adhered to.

Secondly, the testimony of Dr. Pitts, though relevant, does not meet the added requirements set forth in R.C.M. 703(d), that is, of necessity and of absence of an adequate substitute. The testimony of Dr. Pitts would in large part be cumulative with that [of] Dr. Romberg.

Further, Dr. Romberg, a previously qualified and recognized expert in the field of analysis of urine specimens for drugs of abuse is considered an adequate substitute.

Accordingly, the defense Motion for Production of Dr. Pitts is denied.

Defense counsel shortly thereafter moved for a reconsideration of this decision. He said:

Essentially, Your Honor, what we're basing our reconsideration on is the recent testimony of Dr. Pitts, that given the procedures—the defects, what he feels to be defects in the procedures, that he would not have reported the sample out as being positive. Dr. Romberg's expected testimony is that he does not feel that either of the things that Dr. Pitts feels are defects are defects, and that he would have reported out the sample, given the situation of facts here, as being positive. Dr. Pitts will testify that he would not have reported it out as positive, if he was the director of the organization at that time. And he also will testify that if there was not enough sample to retest, that he would have reported it out as being negative rather than positive, based upon what he feels to be defects in the testing procedures.

The military judge, finding as a matter of fact that Dr. Pitts would testify that he would report the test as negative, nevertheless denied the motion.

---

Article 46, UCMJ, 10 U.S.C. 846, states that "[t]he trial counsel, the defense counsel, and the court-martial shall have *equal* opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." (Emphasis added.) R.C.M. 703, Manual for Courts-Martial, United States, 1984, further states:

(d) *Employment of expert witnesses.* When the employment at Government expense of an expert is considered necessary by a party, the party shall, in advance of employment of the expert, and with notice to the opposing party, submit a request to the convening authority to

authorize the employment and to fix the compensation for the expert. The request shall include a complete statement of reasons why employment of the expert is necessary and the estimated cost of employment. A request denied by the convening authority may be renewed before the military judge who shall determine *whether the testimony of the expert is relevant and necessary, and, if so, whether the Government has provided or will provide an adequate substitute.* If the military judge grants a motion for employment of an expert or finds that the Government is required to provide a substitute, the proceedings shall be abated if the Government fails to comply with the ruling. In the absence of advance authorization, an expert witness may not be paid fees other than those to which entitled under subsection (e)(2)(D) of this rule.

(Emphasis added.) These military law provisions mirror in part the Supreme Court's holdings that, as a matter of fundamental due process, an indigent defendant must be provided "the basic tools of an adequate defense." *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971). *See generally Moore v. Kemp,* 809 F.2d 702, 709–12 (11th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987).

The prosecution based its case against appellant solely on the results of laboratory tests on his urine and the expert testimony of Dr. Romberg, a chemist at the Drug Screening Laboratory in Great Lakes, Illinois. *See generally United States v. Murphy,* 23 M.J. 310 (C.M.A. 1987). This prosecution witness worked at the laboratory that performed the challenged tests but he did not personally conduct them. It was his opinion (in accordance with standard operating procedure at his laboratory) that the greater-than-300–nanogram readings in these reports indicated that appellant's urine specimen "definitely contained cocaine metabolite."

The majority of the Court of Military Review held that the military judge did not err in denying the defense request for its scientific expert because his testimony was irrelevant. Mil.R.Evid. 401 and 402, Manual, *supra.* This somewhat surprising conclusion was premised on the assertion that Dr. Pitts' testimony was limited to the extent of the presence of the cocaine metabolite in appellant's urine and not its absence. The suggestion of the court was that the nanogram count and appropriate cut-off number were matters exclusively related to laboratory certification and the degree of concentration of the drug. Accordingly, they had no bearing on a court-martial's determination whether the drug in any concentration was present in appellant's urine.

The court below too narrowly characterized the scope of the requested witness' testimony and its possible use by the defense. His testimony went directly to the weight or reliability, if any, which should be afforded these test results. *See also United States v. Harper,* 22 M.J. 157, 163 (C.M.A.1986). The Government's own witness, Dr. Romberg, confirms our conclusion. He testified:

Q: Do you know what that instruction says with respect to cut off level for cocaine?

A: Okay, in our SOP the cut off level for cocaine metabolite is 300 nanograms per milliliter for all tests.

Q: And what is a cut off level, can you define that term?

A: Okay, in order to call a sample positive it has to have more than the cut off level amount of drug or drug metabolite in it. For example if there is only 200 nanograms of cocaine metabolite in a sample, cocaine would be present, but we would call that sample negative, it has to exceed 300.

Q: Could you explain why?

A: Okay, again we artifically set this amount higher, much higher tha[n] what we can measure. We can measure down to 5 nanograms on some of the tests. *We did this to make sure there's no possibility of an error coming from either noise or some contamination or any other possibility.*

(Emphasis added.) Moreover, Dr. Pitts' testimony concerning a second test of this urine by a civilian laboratory could also cast some doubt on the accuracy of the Government's tests. Finally, the testimony of a trained expert that he is reluctant to certify a sample as positive would reasonably be expected to have some bearing on the untrained factfinder in his determination of the same matter. *See United States v. Murphy, supra.*

The military judge, of course, did not find that the testimony of Dr. Pitts was irrelevant. However, he found that it was not necessary because his "testimony ... would in large part be cumulative with that [of] Dr. Romberg." He also found that Dr. Romberg was "an adequate substitute" because he was "a previously qualified and recognized expert in the field of analysis of urine specimens for drugs of abuse." We have no doubt that Dr. Romberg was an expert in this field. However, the fact remains that Dr. Pitts, also an expert, had no connection with the challenged laboratory and had examined its reports which were used by the prosecution. More importantly, he had a contrary opinion concerning reliability of the test procedures used, results reached, and conclusions based thereon. In short, his testimony favored the defense and could not reasonably be considered cumulative of Dr. Romberg or replaceable by his testimony.

The pivotal question at trial was whether the factfinder would rely on the laboratory test results produced by the Government as a basis for finding appellant guilty of the charged drug offense. *See generally United States v. Harper,* 22 M.J. at 164. This evidence, coupled with the government expert's interpretation of these results, was the only evidence of guilt presented by the prosecution. *See United States v. Ford,* 23 M.J. 331, 337 (C.M.A. 1987). To deny the defense a meaningful opportunity to present its evidence, which challenged the Government's scientific proof, its reliability, and its interpretation, denied appellant a fair trial. *See United States v. Murphy,* 23 M.J. at 312. *See generally Crane v. Kentucky,* 476 U.S.

683, 689–91, 106 S.Ct. 2142, 2146–47, 90 L.Ed.2d 636 (1986); *Little v. Armontrout,* 835 F.2d 1240, 1243 (8th Cir.1987) (en banc), *cert. denied,* —— U.S. ——, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988); *United States v. Patterson,* 724 F.2d 1128, 1129–30 (5th Cir. 1984).

The decision of the United States Navy-Marine Corps Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy. A rehearing may be ordered.

EVERETT, Chief Judge (concurring):

Mindful of the danger that drugs pose for the military establishment, this Court has avoided imposing unduly rigorous limitations on the Government's efforts to combat this hazard. For example, we have held that compulsory drug tests could be performed on personnel entering a military installation. *Murray v. Haldeman,* 16 M.J. 74 (C.M.A.1983). We have allowed introduction into evidence of drug test results and have held that these results were legally sufficient to uphold a conviction for drug use. *United States v. Heyward,* 22 M.J. 35 (C.M.A.), *cert. denied,* 479 U.S. 1011, 107 S.Ct. 656, 93 L.Ed.2d 710 (1986). Indeed, typical convictions for drug abuse are predicated on testimony that a drug test of the accused has proved positive.

We are aware that the massive drug-testing program of the armed services can never obtain perfect accuracy. Urine specimens can be misplaced or misidentified; flaws can exist in the equipment used for the tests; and laboratory technicians can make mistakes in testing. In recognition of the potential for error and the severe consequences of such error for the servicemember, the armed services have promulgated directives seeking to assure that drug tests will be performed as accurately and professionally as possible.

Despite the procedures employed to safeguard the validity of drug testing, test results should not be accepted uncritically as evidence. In order better to assure

their accuracy, the defense must be provided a meaningful opportunity to question the test results. Thus, the defense must be granted discovery of the results before trial. Upon request, the defense also must be furnished the services of an expert who can evaluate and explain the testing techniques and the test results and, if necessary, testify thereon. *Cf. Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

In preparing its case, the Government is assisted by experts; and government experts can be made available to the defense as consultants and witnesses. However, often the defense will wish to have its own consultant and witness, instead of testimony from a government expert who may espouse views hostile to the defense position. Neither civilian nor military law guarantees an accused the right to the expert of his choice. Indeed, the Manual for Courts-Martial, United States, 1984, specifically recognizes that the Government may "provide an adequate substitute" for a requested expert. R.C.M. 703(d); *cf. United States v. Garries,* 22 M.J. 288 (C.M.A.), *cert. denied,* 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986). However, where there are divergent scientific views, the Government cannot select a witness whose views are very favorable to its position and then claim that this same witness is "an adequate substitute" for a defense-requested expert of a different viewpoint.

In light of the considerable latitude which this Court has heretofore granted to the Government in its urinalysis program, it is only fair that servicemembers accused of using drugs be given meaningful access to experts who are willing to challenge testing procedures and results. Therefore, I conclude that appellant's request for the

services of Dr. Pitts should have been granted. His credentials as an expert were unquestioned. He was familiar with the procedures being used at the laboratory which had tested appellant's urine specimen, and he had reviewed the laboratory documentation. The proffer of his testimony was very specific. That testimony, as I interpret the proffer, would have raised a question not only as to how much cocaine Van Horn had used but also whether he had used any at all. Under these circumstances, the defense request that Dr. Pitts be made available to testify should have been granted; * so I join Judge Sullivan's opinion.

COX, Judge (dissenting):

At the outset of the court-martial, before any evidence was presented or any testimony taken, appellant moved for production of a civilian expert witness at government expense. According to the defense proffer, the expert would testify that the technicians who worked at the Navy drug laboratory failed to follow their own standard operating procedures (SOP) in certain respects for conducting the gas chromatography/mass spectrometry test on appellant's urine sample. Accordingly, the expert would challenge the validity of the Navy lab's test results, which indicated that the appellant's sample contained cocaine. Based on test documentation, the civilian expert would not have reported positive findings.

Allegedly, his conclusion was buttressed by a retest of another portion of that same urine sample, apparently conducted by a civilian laboratory not connected with the defense expert. The results of that test, it was contended, were so low that the sample could not have been positive when the Navy laboratory tested it.[1] No evidence of

---

* Sometimes, defense requests for expert or other witnesses can be used as a tactic to create pressure on the Government to drop charges or to plea-bargain. Because of the cost associated with obtaining the presence of an expert witness, the temptation to use this leverage may be especially great. We do not condone these tactics; and the ethics of an attorney who engages therein may be questioned. However, nothing in the present record indicates that appellant was simply trying to harass the prosecution. Instead, he apparently was making a good-faith request for expert testimony to corroborate his denial of drug use.

1. As found by the judge, the initial gas chromatography/mass spectrometry test was conducted

the retest or its results was introduced at trial, and none is attached to the record.

According to a government chemist's testimony, cocaine metabolite decomposes over time, and the rate of decomposition depends upon the PH of the urine and the temperature of storage. Neither of these factors is in evidence, and it is not represented that the defense expert had access to them.

By simple comparison of the laboratory's standard operating procedures and documentation, the military judge could determine that the prescribed quantities, settings, and tolerances, etc., which had been specifically cited in the proffer, were, in fact, consistent. Accordingly, the judge found that "there is no evidence before this court from which to conclude that the procedures of the Standard Operating Procedure were violated." It may also be noted that there was no evidence or proffer that the standard procedures, when followed, produced invalid results.

During opening argument, defense counsel essentially conceded that the prescribed

laboratory procedures had been followed. He took the position, however, that even greater accuracies might be obtained if still more stringent standards were utilized.[2] His thesis failed to take into consideration the fact that the cut-off standards are set much higher than necessary for the very reason that variations in testing do occur within a fairly narrow range. Thus, when the actual nanogram count is close to the predetermined cut-off level, it is entirely possible that a given sample may indicate slightly to the positive one time and slightly to the negative at another time. The difference is not that one test quantity contains cocaine and the other does not, for clearly both do. The difference is that sometimes, due to administrative happenstance, one servicemember is subject to court-martial, and another receives a windfall.

During the prosecution's case-in-chief, the government chemist explained the lab testing procedures and interpreted the findings. The defense undertook a vigorous cross-examination. Not once, however,

on March 27, 1985, and the civilian retest was run "[o]n or after 6 June 1985," a period exceeding 2 months. These dates were not challenged at trial by the defense and they have not been challenged before us. Trial defense counsel's argument as to the significance of the retest includes the following:

The Government also substantially misstates Dr. Pitts' [the expert] testimony with respect to the decomposition of the sample in question. The Government states that Dr. Pitts' testimony will be that the decomposition occurring in Petty Officer Van Horn's sample was not unusual. The implication being that his testimony would be that the fall in measurement from the 347 nanograms per milliliter measured in the first test to the below 200 nanogram per milliliter measured in the retest could be solely attributable to decomposition. Such is totally incorrect. Dr. Pitts will testify it is not unusual for a sample to drop 147 nanograms *in 25 days* as a result of decomposition. However, he will testify that a sample testing at 347 nanograms per milliliter, such as the accused's, is unlikely to fall below 200 nanograms per milliliter *in 25 days,* solely as the result of decomposition. (Emphasis added.)

2. Defense counsel's argument was as follows:
The defense also intends to show that the lab did not follow the tenor of the Standard

Operating Procedures in allowing noise to register on the 303 channel during the testing and by its failure to set the sensitivity level high enough to ensure accuracy in the testing procedures. The Government, it is expected, will attempt to show that the SOP was technically followed. But it is our position that when someone's life is involved that the lab should not walk a fine line between what is technically correct and what would result in an inaccurate result, but that the most accurate result possible should be obtained. The defense contends that such was not done in this instance. What we're dealing with here is a sample that tested 347, not 500. Such was only 47 nanograms above the 300 nanogram cut off level. When it is this close, the inaccuracies could have made the difference between a positive and a negative.

In summation, it is the defense's position that due to mishaps occurring [at] the lab, possibilities of contamination arising therefrom and the failure of the lab personnel to investigate the cause of the noise registering on the 303 channel, and to set the sensitivity level high enough to ensure an accurate quantification, that some doubt exists as to whether or not Petty Officer Van Horn's sample was above the 300 nanogram cut off level....

during the lengthy querying, did defense counsel confront the witness with an alleged departure from the SOP (which is attached to the record as a prosecution exhibit). Moreover, in response to the original defense proffer, the government chemist conducted several controlled laboratory experiments in which he varied the specific parameters cited in the defense proffer. The results showed insignificant effect on "quantification," *i.e.*, nanograms per milliliter. Further, the defense did not renew its request for its expert after the Government's case-in-chief.

This is not a case in which the defense requested an expert to assist it in the preparation of its case. *See Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). If it had, it likely would not have been provided a high-priced civilian if a government expert had been available. The proffer that the SOP had been violated was shown to be incorrect and was abandoned. The claim that higher parameter standards would produce significantly more accurate results was disproven, and no basis for rebuttal was alleged. Finally, no foundation was indicated for the assertion that the retest tended to disprove the nanogram count of the initial test. All that was left was the naked claim that the civilian expert would not have reported positive findings based on the Navy lab's documentation.

Like the military judge, I am of the opinion that this proffer was insufficient to establish the relevance or helpfulness of the witness. *See* Mil.R.Evid. 401, 402, and 702, Manual for Courts-Martial, United States, 1984.

I would affirm the decision of the United States Navy-Marine Corps Court of Military Review.