**UNITED STATES, Appellant
and Cross–Appellee**

v.

**Charles R. COMBS, Sr. Technical
Sergeant, U.S. Air Force, Appellee
and Cross–Appellant.**

No. 93–5003.
CMR No. 29350.

U.S. Court of Military Appeals.

Argued Nov. 9, 1993.

Decided June 15, 1994.

For the Accused: *Captain Ursula P. Moul* (argued); *Colonel Terry J. Woodhouse* (on brief); *Colonel Jay L. Cohen* and *Lieutenant Colonel Frank J. Spinner*.

For the United States: *Major Jeffrey C. Lindquist* (argued); *Colonel Richard L. Purdon* and *Colonel Jeffery T. Infelise* (on brief).

*Opinion of the Court*

COX, Judge:

In August and September 1990, the accused was tried by a general court-martial composed of officer and enlisted members at Kadena Air Base, Okinawa, Japan. Contrary to his pleas, he was convicted of willful disobedience of a lawful order not to be alone with his children, unpremeditated murder of his 18–month–old son, and battery of his 3–year–old daughter, in violation of Articles 91, 118, and 128, Uniform Code of Military Justice, 10 USC §§ 891, 918, and 928, respectively. He was sentenced to a dishonorable discharge, confinement for 50 years, total forfeitures, and reduction to airman basic (E–1). The convening authority approved the sentence. The Court of Military Review set aside the findings of guilty to the Charge and specification of unpremeditated murder, and the sentence, but affirmed the findings of guilty to the two remaining charges. 35 MJ 820, 828 (1992).

Pursuant to Article 67(a)(2), UCMJ, 10 USC § 867(a)(2) (1989), the Judge Advocate General of the Air Force certified the following issue for review by this Court:

> WHETHER THE AIR FORCE COURT OF MILITARY REVIEW ERRED IN *UNITED STATES V. COMBS* BY HOLDING THAT THE MILITARY JUDGE ABUSED HIS DISCRETION WHEN HE PRECLUDED A DEFENSE EXPERT, DR. GRANT, FROM TESTIFYING AS TO THE ULTIMATE ISSUE IN THE CASE, I.E., TESTIFYING THAT THE ACCUSED DID NOT INTEND TO KILL OR INFLICT GREAT BODILY HARM WHEN HE SHOOK HIS SON TO DEATH.

The Government evidence shows that in February 1990, the accused was living in government housing at Camp Foster, Okinawa, with his wife; their 3–year–old daughter, Leslie; and their 17–month–old son, CJ. At 4:40 a.m. on February 14, after working approximately 13 hours, the accused returned home to take care of his children so his wife could go to work. His wife went to work, and the accused went to sleep on a futon. The accused was awakened by his children at 7:30 a.m., and he prepared a bottle for his son. As he walked into the bedroom where his children were, he claims he "lashed out ... attempting to clear anything (toys, furniture) out of [his] path towards [his] son's crib." In doing so, he struck his daughter in the leg. Leslie's thigh bone was broken, and she remained in the hospital for 2 weeks. At the time of the battery, the accused had been sick with the flu, had worked all night, and was tired and angry. In addition, he was experiencing marital and financial troubles.

As a result of the battery, the accused's first sergeant ordered him not to be alone with his children and set a policy whereby he could only see his son and daughter when escorted by another adult. Consequently, the accused moved into his squadron dormitory.

As found by the Court of Military Review, on March 28, 1990, the accused violated this restriction by babysitting his children while his wife went to work and being alone with them until she returned. 35 MJ at 822. At approximately 2:30 p.m., the accused and his wife called an ambulance to take CJ to the hospital because he would not respond to any kind of stimuli. Doctors found swelling of the brain and damage to CJ's central nervous system but no fracture to his skull. All evidence was consistent with the shaken-baby syndrome. CJ was declared brain dead on April 6, and he died that same day when he was removed from life support systems. His cause of death was determined to be shaken-infant syndrome. The accused later admitted shaking his son.

At trial, the defense intended to focus on the accused's lack of intent to kill or inflict great bodily harm. Counsel requested the assistance of Dr. Grant, a forensic psychiatrist, for the purpose of showing the accused could not have formed the requisite intent for unpremeditated murder at the time he shook CJ. The military judge ordered that Dr. Grant be brought to Kadena Air Base as an expert consultant and witness.

The defense originally sought to have Dr. Grant testify that the accused could not have formed the intent to murder his son. In an Article 39(a), UCMJ, 10 USC § 839(a), session, Dr. Grant testified that his opinions were based on the following facts: the accused was experiencing marital problems, environmental stress, and sleep deprivation; the accused previously had sought psychological help and family counseling; and in the past, he had shaken his son in public when scolding him. He also testified that, in his opinion, the accused was a child abuser and child abusers do not have the intent to kill their victims.

Also central to the defense theory was evidence that CJ's hand was near his mouth and that he had mucus around his mouth when the accused took him from his crib. CJ had a habit of putting his fingers in his mouth and vomiting as a result. The accused became very angry when CJ did this because of his belief that children who suck their fingers will become homosexuals. Dr. Grant opined that on March 28, CJ had been sucking his fingers, had made himself vomit, and as a result, the accused became extremely upset and experienced "ego disintegration," meaning he could not think rationally and was unable to form the requisite intent to commit unpremeditated murder when he shook his son. The prosecution did not object to having Dr. Grant testify as to whether the accused could have formed the requisite intent.

However, during a recess of the Article 39(a) session, Dr. Grant's opinion changed. Because of an explanation by the psychologist who performed the psychological testing on which Dr. Grant relied, Dr. Grant was no longer of the opinion that the accused could not have formed the intent to murder CJ at the time he shook him. From what he had learned, Dr. Grant concluded the psychological tests could not be said to unequivocally reflect the accused's state of mind at the time of the offense but reflected his condition during pretrial confinement after his son's death. He could not say the accused was not capable of forming the intent; he could only opine that the accused did not form the intent to kill or inflict great bodily harm.

■ The Government argued that Dr. Grant's testimony that the accused could have, but did not, form the intent to kill or inflict great harm was speculative, without adequate foundation, confusing, and not helpful to the triers of fact. The military judge agreed. The military judge failed to distinguish between the concepts of necessary testimony and helpful testimony in concluding Dr. Grant's testimony was inadmissible:

> The Court frankly believes that the court members are as able to make those kind of determinations [regarding intent] as Doctor Grant in this case, and the Court does not believe that expertise of Doctor Grant as a forensic psychiatrist would assist the members in this regard.

We agree with the Court of Military Review that the military judge apparently applied the narrower of the two standards, the necessary standard, 35 MJ at 826, and this was error.

The Court of Military Review overturned the judge's ruling. It noted that the military judge applied the wrong standard in articulating some of his reasons for granting the Government's motion to prevent Dr. Grant from testifying. In addition, he did not allow for rebuttal and cross-examination as a means of clearing up any confusion. The judge's ruling on Dr. Grant's testimony was not made until after the Government had presented its case, and the Court of Military Review concluded the accused was deprived of testimony key to his defense. The court held the accused should have been given the benefit of the doubt and that the military judge abused his discretion to the prejudice of the accused. 35 MJ at 826–27.

We agree.

■ Mil.R.Evid. 401, 402, 403, 702, 703, and 704, Manual for Courts–Martial, United States, 1984, apply to admissibility of expert testimony.[1] Mil.R.Evid. 402 provides for ad-

---

1. We have addressed the issue of admissibility of expert testimony at length. The analytical model set forth in *United States v. Houser,* 36 MJ 392 (CMA), *cert. denied,* —— U.S. ——, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993), requires that the following be established:

missibility of "relevant evidence." Mil. R.Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Dr. Grant's testimony that the accused did not form the intent to kill or seriously injure his son at the time of the crime concerns one of the elements of unpremeditated murder and is certainly relevant here.

■ Pursuant to Mil.R.Evid. 403, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The Government argued that Dr. Grant's testimony would have been more confusing than helpful. We disagree. Dr. Grant would have stated his conclusion that the accused did not intend to kill or inflict great bodily harm upon his son; then he would have explained his reasons for his opinion. They are: (1) the accused loved his son; (2) the lethality of shaking an infant is not commonly known; and (3) the accused fit the profile of a child abuser, and child abusers generally use force to discipline, not to kill. This is not so confusing as to warrant exclusion under Mil.R.Evid. 403. While portions of Dr. Grant's testimony appear to constitute inadmissible profile evidence, *see United States v. Banks*, 36 MJ 150 (CMA 1992), much of what he had to say about the accused's mental condition and symptoms associated with diagnosis was admissible.

■ Mil.R.Evid. 702 allows for expert testimony "in the form of an opinion or otherwise" which "will assist the trier of fact to understand the evidence or determine a fact in issue." To make the determination, "the proper standard is helpfulness, not absolute

necessity." *United States v. Meeks*, 35 MJ 64, 68 (CMA 1992), *citing United States v. Nelson*, 25 MJ 110, 112 (CMA 1987), *cert. denied*, 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988); *United States v. Solis*, 923 F.2d 548, 550 (7th Cir.1991). The military judge concluded that Dr. Grant's testimony would not be helpful to the triers of fact because the members could reach their own conclusions without expert testimony. While the members were capable of coming to their own conclusions without the benefit of expert testimony, we think Dr. Grant's opinion as a forensic psychiatrist could have been of assistance.

■ Mil.R.Evid. 703 requires that the facts or data which are the bases of the expert's opinion be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Dr. Grant based his opinion on "OSI reports, the accused's mental health records, the Family Service Center records, the Family Advocacy records, the two sanity boards," conversations with the accused's supervisor, his First Sergeant, his first wife, and others in the accused's squadron, as well as 20 hours of conversation with the accused. The military judge was concerned about the bases for Dr. Grant's testimony. He noted much of the information Dr. Grant obtained was inadmissible hearsay; however, Mil. R.Evid. 703 specifically provides that the facts on which the expert's opinion is based "need not be admissible in evidence." We think the foundation of Dr. Grant's testimony was sufficient.

Finally, turning to Mil.R.Evid. 704, the testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *See United States v. Hill–Dunning*, 26 MJ 260 (CMA 1988), *cert. denied*, 488 U.S. 967, 109 S.Ct. 494, 102 L.Ed.2d 531 (1988). *Cf. United States v. Azure*, 801 F.2d 336, 340 (8th Cir.1986); *United States v. Arruza*, 26 MJ 234, 237

(A) the qualifications of the expert, Mil.R.Evid. 702; (B) the subject matter of the expert testimony, Mil.R.Evid. 702; (C) the basis for the expert testimony, Mil.R.Evid. 703; (D) the legal relevance of the evidence, Mil.R.Evid. 401 and 402; (E) the reliability of the evidence, *United States v. Gipson*, 24 MJ 246 (CMA

1987), and Mil.R.Evid. 401; and (F) whether the "probative value" of the testimony outweighs other considerations. Mil.R.Evid. 403. . . .

*Id.* at 397. *See also United States v. Banks*, 36 MJ 150, 161 (CMA 1992).

(CMA 1988); *see also* 26 MJ at 239 (Sullivan, J., concurring in the result) (agreeing that experts may not give their opinion as to a witness' truthfulness), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989).

We agree with the Court of Military Review that the military judge abused his discretion in granting the Government's motion to prevent Dr. Grant from testifying. *See United States v. Houser,* 36 MJ 392, 397 (CMA), *cert. denied,* —— U.S. ——, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993). The Military Rules of Evidence liberally allow for expert testimony to assist the trier of fact.

Accordingly, the certified issue is answered in the negative.[2]

The decision of the United States Air Force Court of Military Review setting aside the conviction for unpremeditated murder and the sentence is affirmed.

Chief Judge SULLIVAN and Judges CRAWFORD, GIERKE and WISS concur.

---

2. We need not decide the granted issues.