UNITED STATES, Appellee

v.

David L. JOHNSTON, Staff Sergeant
U.S. Air Force, Appellant.

No. 93–0465.
CMR No. S28459.

U.S. Court of Military Appeals.

Argued March 3, 1994.

Decided Sept. 23, 1994.

For Appellant: *Captain Richard D. Desmond* (argued); *Colonel Terry J. Woodhouse* and *Captain Ursula P. Moul* (on brief); *Colonel Jay L. Cohen* and *Lieutenant Colonel Frank J. Spinner.*

For Appellee: *Colonel Jeffery T. Infelise* (argued); *Captain Timothy G. Buxton* (on brief); *Major M. Kongable.*

*Opinion of the Court*

CRAWFORD, Judge:

Appellant was tried by a special court-martial with members and, contrary to his pleas, was found guilty of wrongful use of marijuana (2 specifications), in violation of Article 112a, Uniform Code of Military Justice, 10 USC § 912a. Appellant was sentenced to a bad-conduct discharge, partial forfeitures, and reduction to E–3. The convening authority approved the adjudged sentence; the court below affirmed the findings and sentence; and we granted review of this issue:

> WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN EXCLUDING EVIDENCE OF A NEGATIVE URINALYSIS REPORT FOR THE PRESENCE OF THC [tetrahydrocannabinol] SUBMITTED ON APPELLANT THREE DAYS AFTER THE LAST CHARGED USE OF MARIJUANA.

We hold that, under the facts of this case, the judge did not abuse his discretion in excluding the defense proffered evidence of appellant's "negative" urinalysis test result.

## FACTS

Appellant was charged with using marijuana on two occasions: on or about July 27, 1990, and on or about September 1, 1990. To prove the July 27, 1990, use, the Government presented the testimony of Special Agent (SA) John S. Johnson, of the Air Force Office of Special Investigations (OSI) and Staff Sergeant Paul G. Robertson, an undercover source. SA Johnson testified that he met appellant during an undercover investigation of appellant's alleged drug abuse, and that he observed appellant inhale from a marijuana cigarette one time and pass the marijuana cigarette on to others without smoking it one other time. Agent Johnson's ability to observe appellant was vigorously questioned on cross-examination because the alleged use occurred after dark; the light source came from behind appellant who was standing about 10 feet away; and appellant also held a lit tobacco cigarette in the same hand.

Staff Sergeant Robertson also testified that he observed appellant use marijuana on July 27, 1990. Sergeant Robertson's testimony differed from Agent Johnson's testimony in that he described the parties as being closer together and testified that appellant passed the marijuana cigarette without smoking it about four times and that appellant was not smoking a tobacco cigarette while smoking the marijuana cigarette. Sergeant Robertson also testified that he had drunk about five beers before the marijuana cigarette was passed and that, on a few other occasions, marijuana cigarettes had been produced and smoked in appellant's presence and appellant did not touch the marijuana cigarette.

Staff Sergeant Robertson provided the only evidence concerning appellant's use of marijuana on September 1, 1990. He testified that he saw appellant inhale from a marijuana cigarette three or four times.

The defense case on findings consisted of the testimony of three witnesses: Master Sergeant Manual Guerra, Staff Sergeant David A. Timm, Jr., and Captain David A. Shields. They all testified to appellant's good military character and his character for lawfulness. The defense also offered appellant's performance reports which established his exemplary military service.

The contested evidence is trial defense counsel's offer of the results of a "negative" radioimmunoassay (RIA) test of a urine sample given by appellant on September 4, 1990, 3 days after his alleged use on September 1, 1990. Before entering pleas, the defense, relying on *United States v. Arguello*, 29 MJ 198 (CMA 1989), moved *in limine* to suppress a government explanation of the RIA test results which defense intended to offer. The Government did not oppose the reference to a specific nanogram level, and the military judge granted the defense's *Arguello* motion. Later, the Government moved *in limine* to prevent the defense from introducing the RIA test results altogether. The Government based its motion on grounds that the test without explanation was irrelevant under Mil.R.Evid. 401 and 402, Manual for Courts–Martial, United States, 1984, and that any probative value it may have had was substantially outweighed by the confusion and misleading nature of the evidence under Mil.R.Evid. 403.

In support of its motion, the Government called Dr. John Vasiliades, a forensic toxicologist. Dr. Vasiliades testified that appellant's urine was reported as testing negative. Dr. Vasiliades also testified that the probativeness of the test results depended on how heavily the subject used marijuana.

The judge ruled as follows:

Gentlemen, I've had an opportunity to consider the motion of the prosecution and to reflect upon the information contained in Appellate Exhibit II, as well as the information presented to me in the testimony of Dr. Vasiliades. I would note that I consider[ed] the following points of that information to be particularly relevant, that is, specifically that the only test apparently used on this particular sample was the radioimmunoassay test; that the Appellate Exhibit II does apparently reveal the presence of some level of the metabolite of THC in the urine, although below the level considered positive for purposes of reporting this test. I find the RIA test is not a reasonable—is a method reasonably relied

upon by experts in this particular field to determine the presence or absence of the metabolites of THC by itself, but only in conjunction with further tests ordinarily used under the DoD [Dept. of Defense] regulations, that is, the GC/MS [Gas Chromatography/Mass Spectrometry] test. I do find that this information proposed by the defense would be marginally relevant under Military Rules of Evidence 402, very marginally so, and considering the fact that the test does show the presence of some metabolites of THC, although below the cutoff level, I have also considered that under MRE 403, I find that the very marginal relevance of this particular test is more than substantially outweighed by a very substantial risk of misleading and confusing the members of this particular court-martial or any court-martial, for that matter. Therefore, I will grant the prosecution's Motion in Limine to suppress the results of this particular test.

Trial defense counsel responded to this ruling "on the record" insisting that this Court's decision in *Arguello* commanded a different result.

### DISCUSSION

We begin our analysis by reviewing the impact of our holding in *Arguello* which goes to the heart of the issue before us.

In *Arguello* the defense sought to suppress rebuttal evidence introduced by the Government on the bases that the sample was destroyed and the results fell below the DOD cutoff level for reporting a test as positive. During his opening statement, defense counsel argued that Arguello gave a urinalysis sample which came up negative. The defense supported this with the testimony of an expert witness who testified that if the defendant smoked marijuana, the expert would expect a positive urinalysis test the next day. In rebuttal the Government also called an expert witness who testified that the accused's RIA reading of 32,650 radioactive counts per minute conclusively determined that THC metabolites were present in his urine.

This Court indicated in *Arguello* that it was not necessary to decide the case on whether appellant's Constitutional right to due process was violated by destruction of the urine sample. 29 MJ at 203. The Court went on to hold that the rebuttal by the prosecution was improper because the DoD Directive prohibited introduction of RIA tests which fell below a certain level.

Here, appellant argues that, based upon *Arguello*, "Negative urinalysis results are clearly admissible to cast doubt on testimony that an accused used a particular drug on a particular occasion." Final Brief at 5. That argument appears to be an oversimplification of the issue before us. As trial defense counsel noted and argued to the judge, *Arguello* would not only preclude admission of this evidence, but would also prohibit the Government from rebuttal based upon urinalysis test results which fall below the conservatively high standard of the DoD Directive. Thus it appears that the impact of *Arguello* and its progeny (1) overlook the truthfinding purpose of a trial, (2) abandon the Military Rules of Evidence governing introduction of scientific evidence, and (3) rely on Service Directives to suppress what may otherwise be reliable evidence.

Indeed, at oral argument the Government recognized this impact and argued:

*Arguello* ... carved out an exception to urinalysis results that doesn't apply to any other type of scientific evidence or expert testimony. In doing that the Court went off the path as to the Military Rules of Evidence. This is an opportunity to get us back out of the wilderness and on the beaten path for the military rules. As appellant's counsel has accurately pointed out, the standard for review is abuse of discretion, whether or not the military judge in this case abused his broad discretion in excluding the results of negative urinalysis, and, as pointed out during the argument by appellate defense counsel, to set the stage for this, it started with a motion *in limine* by defense counsel. Based on *Arguello*, what he wanted to do

is to say that here is a negative urinalysis result but you can't talk about it. You can't tell anybody what it really means. And trial counsel's response is: we have no problem with not bringing up a negative urine sample, but defense counsel said, under Rule 401–402, we don't think these results are relevant at all. Therefore, the defense asked the judge to exclude it.

■ The purpose of a trial is truthfinding within Constitutional, statutory, and ethical considerations. *Nix v. Whiteside,* 475 U.S. 157, 174, 106 S.Ct. 988, 998, 89 L.Ed.2d 123 (1986) ("a system of justice [must be] dedicated to a search for the truth"); *Jenkins v. Anderson,* 447 U.S. 231, 237, 100 S.Ct. 2124, 2128, 65 L.Ed.2d 86 (1980) (prearrest silence by defendant may be used to impeach, assuming no prior rights' warnings); *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) (illegally seized evidence may be used to impeach defendant's trial testimony). But truthfinding is not inconsistent with a system designed to secure our national security.

The Government recognizes that the impact of *Arguello* is to permit an accused to perpetrate what is tantamount to a fraud upon the court. "If an accused can testify that he has never used drugs, although there is the presence of them in his 'negative' urinalysis, and the Government is not permitted to rebut that testimony, the accused can lie without any fear of being confronted by the truth." Answer to Final Brief at 2. In essence, *Arguello* would permit defense counsel to use the nanogram cutoff in the DoD Directive and service regulations as a sword to undermine the truthfinding of the trial.

■ Admissibility of scientific evidence * is governed by the Military Rules of Evidence. The analytical model for determining admissibility was set forth in *United States v. Combs,* 39 MJ 288 (CMA 1994), *citing United States v. Houser,* 36 MJ 392, 397(CMA), *cert. denied,* —— U.S. ——, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993). It requires that the following be established:

(A) the qualifications of the expert, Mil.R.Evid. 702; (B) the subject matter of the expert testimony, Mil.R.Evid. 702; (C) the basis for the expert testimony, Mil.R.Evid. 703; (D) the legal relevance of the evidence, Mil.R.Evid. 401 and 402; (E) the reliability of the evidence, *United States v. Gipson,* 24 MJ 246 (CMA 1987), and Mil.R.Evid. 401; and (F) whether the "probative value" of the testimony outweighs other considerations, Mil.R.Evid. 403.

39 MJ at 290 n. 1.

Subsequent to the model set forth in our opinion in *Houser,* the Supreme Court of the United States set forth a similar analysis in *Daubert v. Merrell Dow Pharmaceuticals,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which this Court recognized in *United States v. Rodriguez,* 37 MJ 448 (CMA 1993).

■ Contrary to *Arguello,* a violation of the DoD Directive should not lead to exclusion of evidence. *Cf.* Drafters' Analysis of Mil.R.Evid. 311(c)(1), Manual, *supra* at A 22–17. The issue is whether the proffered scientific evidence otherwise satisfies the rules of evidence. We specifically reject the view that this Court has carved out a special exception for urinalysis test results that would determine admissibility based upon DoD and service directives rather than the Military Rules of Evidence.

Here the judge applied the Military Rules of Evidence in determining that admission of the defense proffered evidence had a substantial risk of misleading and confusing the members of the court-martial. Given the judge's concerns over the relevance, reliability, and danger of confusion with this evidence, and given the impact of this Court's opinion in *Arguello,* we hold that the judge did not abuse his discretion in excluding evidence of appellant's "negative" urinalysis test results. Although we now overrule *Arguello,* we need not decide today whether use by the Government of "negative" test results in its case-in-chief would be barred by some other

---

* Normally this evidence is presented through expert witnesses, *see, e.g., United States v. Murphy,* 23 MJ 310 (CMA 1987); *United States v. Harper,* 22 MJ 157 (CMA 1986). *But see* Mil.R.Evid. 803(6), 803(8), and 803(18), Manual for Courts-Martial, United States, 1984.

rule of law. *United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. Thompson*, 33 MJ 218, 221 (CMA 1991), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992).

The decision of the United States Air Force Court of Military Review is affirmed.

Judge GIERKE concurs.

COX, Judge (concurring):

*What's in a name? that which we call a rose*

*By any other name would smell as sweet.*

Shakespeare: *Romeo and Juliet*, ii, 2, 42 (1595), quoted in *The Macmillan Book of Proverbs, Maxims, and Famous Phrases* 1655:6 (1965).

Whether one uses a prism or a microscope, a urine sample containing metabolites of a controlled substance is still a urine sample containing metabolites of a controlled substance. When I read the dissents of my Brothers, I sometimes think I am going mad.

It is a recognized scientific principle that a sample is positive if it contains any trace of the tested substance, whether that be one kilogram (1000 grams), one nanogram (one billionth of a gram), or a picogram (one trillionth of a gram). It is negative if it contains zero or no trace whatsoever of the tested substance.

Because the dissenters seem to think there is something magical about the regulations governing drug testing, the Department of Defense might consider adopting new terms covering urine samples. For example:

1. Negative means zero or none, or no metabolites.

2. Inconclusive means more than zero but an insufficient amount to warrant further testing or prosecution based solely on the result. *See United States v. Harper*, 22 MJ 157 (CMA 1986); *United States v. Arguello*,

29 MJ 198, 207 (CMA 1989) (Cox, J., concurring in the result).

3. Positive means that the level of the substance in the sample is high enough for an expert to opine that an accused knowingly ingested the illegal substance.

Then it will be clear that the Military Rules of Evidence will control admissibility, as they do with every other scientific test. The question will always be whether the test results are relevant and reliable for the purpose offered. The States have long since dealt with these types of evidentiary inferences arising out of breath analysis used in driving-under-the-influence (DUI) cases.

SULLIVAN, Chief Judge, dissenting:

I must dissent. The principal opinion unfairly ignores the Constitutional and codal rights of a military accused to present a defense at his court-martial. *See United States v. Brown*, 41 MJ 1 (CMA 1994). *See generally Delaware v. Van Arsdall*, 475 U.S. 673, 678–80, 106 S.Ct. 1431, 1434–36, 89 L.Ed.2d 674 (1986). Furthermore, it implicitly denigrates the members of courts-martial panels and their ability to consider and resolve questions of fact involving scientific evidence. *See generally United States v. Hunt*, 33 MJ 345 (CMA 1991); *United States v. Murphy*, 23 MJ 310 (CMA 1987). Finally, inexplicably, it undermines the integrity and evenhandedness of the Department of Defense Urinalysis Program and misconstrues the previous holding of this Court in *United States v. Arguello*, 29 MJ 198 (CMA 1989). *See United States v. Sutton*, 31 MJ 11, 18–19 (CMA 1990); *United States v. Joyner*, 29 MJ 209 (CMA 1989).[1] All this the principal opinion does under the rubric of a judge's discretion in excluding confusing or misleading evi-

---

1. Defense counsel made a pretrial motion to "prevent the Government, either in its case-in-chief or in rebuttal, from introducing evidence that would go under and try to explain a negative urinalysis...." The military judge, with the approval of the prosecution, however, granted this motion to the extent that the prosecution did not intend to affirmatively use the negative test re-

sults to show marijuana use by appellant. This ruling complies with the decision of this Court in *United States v. Arguello*, 29 MJ 198 (CMA 1989), which holds only that the Government cannot use scientific evidence coupled with a negative urinalysis to affirmatively show marijuana use at a court-martial.

dence under Mil.R.Evid. 403, Manual for Courts–Martial, United States, 1984.

I initially note that appellant was charged in two separate specifications with using marijuana, *i.e.,* on July 27 and September 1, 1990. The Government proffered two witnesses to appellant's use on the first occasion (Sergeant Robertson and Special Agent Johnson) and one witness to appellant's use on the second occasion (Sergeant Robertson). The defense attempted to oppose this prosecution evidence by attacking the credibility and ability to observe of the government witnesses, by showing appellant's good character, and by introducing evidence of a "negative" urinalysis test performed by the Government on September 4, 1990. The military judge refused to admit the evidence of the negative urinalysis on the basis of Mil. R.Evid. 403, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, *confusion of the issues,* or *misleading the members,* or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

(Emphasis added).

The first question to be considered in this case is whether the defense has a Constitutional and codal right to introduce the "negative" results of his urinalysis. This test was administered by the Government, without the accused's consent, and was determined to be "negative" by the Government's own standards. Moreover, the prosecution as a matter of routine uses the "positive" test results of urinalyses to establish the guilt of military accused at courts-martial. *See* Art. 46, Uniform Code of Military Justice, 10 USC § 846. In accord with our past precedent, I conclude that such evidence *coupled with appropriate expert testimony* is favorable to the defense on the question of nonuse [2] and that appel-

lant had a Constitutional and codal right to introduce such evidence of his innocence at his court-martial. *United States v. Mack,* 33 MJ 251 (CMA 1991); *United States v. Joyner* and *United States v. Arguello,* both *supra. See generally Michigan v. Lucas,* 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991); *Taylor v. Illinois,* 484 U.S. 400, 407–10, 108 S.Ct. 646, 652–54, 98 L.Ed.2d 798 (1988). Consistent with our opinion in *Arguello,* once the defense had introduced this evidence, the Government could come in and explain the results to the factfinders using appropriate expert testimony. *This* procedure is fair to both parties.

The second question to be decided is whether the military judge may deny the defense its right to present this evidence because it might mislead the members. *See* Mil.R.Evid. 403. The existence of conflicting scientific evidence on the meaning and importance of urinalysis tests is well known. *See United States v. Ford,* 23 MJ 331 (CMA 1987); *United States v. Harper,* 22 MJ 157 (CMA 1986). Moreover, this Court has recognized that such scientific evidence is admissible as a matter of rebuttal if its particular rebuttal purpose is clearly delineated by the military judge. *See United States v. Arguello, supra* at 205. Finally, this Court has already held that it is Constitutional error to deny the defense the opportunity to challenge the Government's scientific proof, its reliability, and its interpretation. *See United States v. Van Horn,* 26 MJ 434 (CMA 1988). Accordingly, there is simply no authority for denying the defense evidence simply because the contrary scientific evidence might be admitted on its probative value. *See generally Daubert v. Merrell Dow Pharmaceuticals,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

---

2. Trial counsel objected to the defense evidence of urinalysis on the basis of relevance (Mil. R.Evid. 401 and 402, Manual for Courts–Martial, United States, 1984), and undue confusion (Mil. R.Evid. 403). The prosecution called its expert Doctor Vasiliades who admitted the possible probative value of the negative tests. Trial counsel, in his argument, conceded this defense evidence had some probative value. The military judge also found "that this information proposed by the defense would be marginally relevant under [Mil. R.Evid.] 402, very marginally so...." The question of the relevance of a negative urinalysis to show nonuse is a question of expert testimony resolved in appellant's favor at this court-martial. *See generally United States v. Murphy,* 23 MJ 310 (CMA 1987).

The third question to be considered is whether the dispute engendered by admission of negative urinalysis evidence and properly delineated government rebuttal evidence was too confusing for the court-martial members to decide. *See* Mil.R.Evid. 403. This rule, like Fed.R.Evid. 403, does not extend to exclusion of evidence which is crucial to the defense. *See also United States v. Brown*, 41 MJ 1 (CMA 1994). In fact, it is black letter law that it is an abuse of discretion under Fed.R.Evid. 403 to exclude noncumulative crucial defense evidence. *See* J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 403[06] at 403–88 to 403–89 (1994). *See also Delaware v. Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435. I conclude that this evidence was crucial to appellant's defense.[3] Finally, the members of courts-martial are routinely called upon to decide similar questions when the Government's positive results in a urinalysis are challenged by defense scientific evidence. *See United States v. Ford, supra.*

The final question I must decide is whether admissibility of the urinalysis test results should be determined without regard for Department of Defense Directives. The test in this case was, after all, a urinalysis conducted pursuant to the Department of Defense Urinalysis Program. Its view of the reliability of tests results to show drug use in various circumstances is surely a matter to be considered under *Daubert v. Merrell Dow Pharmaceuticals, supra.* Moreover, it cannot seriously be contended that this program was promulgated by the Department of Defense without regard for the rights of individual servicemembers. *See generally United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

In sum, the principal opinion permits, if not encourages, exclusion of all negative urinalysis evidence at courts-martial. It predicates such *an exclusionary rule* on the inability of court members to determine from expert testimony how probative such evidence is on the question of nonuse of drugs.

Such a holding simply ignores the fact that for some 8 years this Court has held that positive urinalysis results accompanied by expert testimony are a sufficient basis for a rational court member to find beyond a reasonable doubt that an accused used drugs. *See United States v. Harper*, 22 MJ 157 (CMA 1986). Such a tilted playing field in my view not only violates the Constitution and the Uniform Code but also belatedly erodes the integrity of the military urinalysis program. Accordingly, I would reverse.

WISS, Judge (dissenting):

I

I have come to appreciate that the Opinion of the Court in *United States v. Arguello*, 29 MJ 198 (CMA 1989), is like a prism: Each individual who looks at it does so from his own unique angle and through his own unique legal lenses (complete with inevitable distortions that develop over the course of a legal career—distortions that might magnify what others might minimize), and the consequence is that each individual's perception of the light is unique. A prism does not reflect colors that are "right," to the exclusion of other colors as "wrong." Each viewer "rightly" sees what he sees—and no other viewer sees the light in quite the same way.

So, apparently, *Arguello*. I notice that the principal opinion here repeatedly refers to the "impact of *Arguello*," distinct from the opinion itself. Subtly, but accurately, this phrasing reflects an understanding that all of what may be said about that opinion and all of what some may believe that it says or does may not, truly, be found there.

Granted, it cannot be denied that the majority opinion in *Arguello* did estop the Government from using a urinalysis screening-test report that was below Department of Defense (DoD) regulatory cutoffs for "positive" results in order to rebut a defense assertion that the report was "negative"—which the Government there contended inac-

---

3. *See United States v. Brechtel*, 997 F.2d 1108, 1114 (5th Cir.1993); *United States v. Gaskell*, 985 F.2d 1056, 1063 (11th Cir.1993); *United States v. Stafford*, 983 F.2d 25, 27–28 (5th Cir.1993); *United States v. Foster*, 982 F.2d 551, 555 (D.C.Cir.1993). *See generally United States v. Spencer*, 1 F.3d 742, 746, 748 (9th Cir.1992) (Reinhardt, J., dissenting).

curately implied to the fact-finders an affirmative finding of the absence of drugs.

On the other hand, it must be acknowledged that this was in the context of a defense complaint that the Government's destruction of the urine sample after the screening test measured below "positive" had deprived the defense of the opportunity to subject that sample to scientifically more discerning tests which might, indeed, produce affirmative evidence tending to indicate non-use.

So, as to *Arguello,* I will leave it alone. While some passages from it might be helpful in some instances, the squabble over what it says or does not say, holistically, is counterproductive.

Instead, I will offer an analytical construct that, for me, appropriately acknowledges both legal principles and practicalities; both defense interests and those of the prosecution; both the primacy of rules of evidence in the courtroom and the proper role of regulatory proscriptions outside the courtroom; and both the important role of the judge to screen proffered evidence to some extent and the ultimate responsibility of the fact-finders to grapple with sometimes complex and conflicting evidence and to find "truth" from it.

## II

Urinalysis evidence is not inherently unlike any other scientific evidence. Some such tests and resultant evidence, but not all, come to be found reliable—at least under some circumstances and at least when properly explained by expert witnesses—and, hence, admissible in judicial proceedings. *See Daubert v. Merrell Dow Pharmaceuticals,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *United States v. Combs,* 39 MJ 288 (CMA 1994); *United States v. Rodriguez,* 37 MJ 448 (CMA 1993); *United States v. Houser,* 36 MJ 392 (CMA), *cert. denied,* —— U.S. ——, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993). Sometimes, as to certain types of such tests, the scientific basis is accepted and, hence, such evidence generally is admissible; yet, under particular circumstances of a certain case, the test may produce results which are so inconclusive as arguably to be irrelevant, confusing, or misleading—and, hence, inadmissible. *See* Mil. R.Evid. 401–403, Manual for Courts–Martial, United States, 1984.

The oft-encountered DoD regulations establishing the Drug Abuse Testing Program, as well as counterpart regulations in the Department of Transportation that apply to the Coast Guard, in a variety of ways restrict the *Government's* use of urinalysis results. Maybe out of concern for individual servicepersons and to assure that none is put through the wringer of a court-martial without virtually sure-fire scientific evidence of knowing use—or maybe in an effort to manage prosecutorial and support resources by avoiding collateral litigation in drug prosecutions over less sure-fire scientific evidence—the government has established certain cut-off points, above which is "positive" either for further testing (in the case of a screening test like the radioimmunoassay) or for prosecution (in the case of a gas chromatography/mass spectrometry). Typically, below such points is a "negative," and prosecutions based on such evidence are barred. Reportedly, the cut-off points are set high enough that, in the usual case and with all other variables constant, scientists would agree that the test reflects recent knowing use. Even for such a test, however, it is not self-explanatory; it will be admissible only when accompanied by testimony of an expert witness to explain the report and its meaning to the factfinder. *See United States v. Harper,* 22 MJ 157 (CMA 1986).

The majority in *Arguello* wrote: "It is beyond cavil that the purpose of these high standards is to protect the servicemember from adverse action based on unreliable scientific testing." 29 MJ at 204. I will not quarrel with that observation; it seems sensible to me that that is at least *one* of the purposes. Thus viewed, agents of the government are bound by it. *See United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. McGraner,* 13 MJ 408 (CMA 1982); *United States v. Dunks,* 1 MJ 254 (CMA 1976).

On the basis of the foregoing, I suggest this construct:

1. If the drug-program regulations bar certain prosecutorial uses of urinalysis readings below a certain level, then the Government is prohibited from even *offering* the evidence for those purposes. In other words, the government's regulations keep its prosecutorial agents from even bringing such evidence through the courtroom doors. Accordingly, even if that evidence arguably would pass the relevance test of the rules of evidence (say, a result that is a single nanogram below the cutoff level), the rules of evidence simply never get applied to determine *admissibility* because the regulations bar the prosecutor from even *offering* the evidence.

2. In all other respects—that is, once the evidence gets through the courtroom doors—urinalysis and the reports thereof are like all scientific tests and their results: To the extent that the profferer of the evidence satisfies the analytical model for admissibility set out in *United States v. Houser, supra* at 397, it will be admitted—whether offered in the case-in-chief, in rebuttal, as impeachment, or whatever; otherwise, it will not. In other words, if the defense seeks to use a urinalysis report as evidence tending to show non-use or unknowing use, or if the prosecution seeks to use such a report for a purpose not barred by regulations, then the rules of evidence will be applied to determine its admissibility.

(This is not a quotation.)

### III

This appeal involves an effort by the defense to use a "negative" RIA test as evidence of non-use and to prevent trial counsel from countering with an expert witness to explain the RIA reading in a way inconsistent with the alleged showing of non-use. Based on the analytical construct offered earlier, these conclusions should follow:

First, to the extent that the defense was prepared to offer expert testimony that the specific reading in question on the RIA was relevant—that is, probative either of non-use or of unknowing use—the evidence was admissible. I share the concerns of the Chief Judge in his separate opinion about keeping out noncumulative crucial defense evidence— evidence which ultimately all parties at this trial acknowledged was relevant—on the basis of Mil.R.Evid. 403 as "misleading and confusing" to the fact-finders. Once key defense scientific evidence is found reliable and relevant, the fact-finders must be trusted to sort out the mess and to find the truth. After all, again as the Chief Judge wryly notes, we trust them to do this when the prosecution offers a "positive" reading.

Second, if this evidence properly had been admitted, the prosecution would not have been barred from offering its own expert witnesses who might explain the reading in a different way. Appellant has pointed to no regulation that keeps such expert witness outside the courtroom. Accordingly, the witness enters the courtroom, and admissibility of his testimony is decided by application of the Military Rules of Evidence.

### IV

On the basis of this analysis, I would set aside the decision below, as well as the findings and the sentence, and authorize a rehearing. Appellant is entitled to his day in court, complete with admission of scientific evidence which all at trial recognized was relevant.