CRAWFORD, Chief Judge
(dissenting):
I respectfully dissent because the majority opinion (1) engages in speculation regarding the military judge’s ruling, and (2) applies a drastic remedy that is contrary to the prevailing practice in federal, state, and military courts. The gist of the majority’s decision is to require the military judge, in factual scenarios such as are present in this case, to set forth all of his or her reasons for sustaining the prosecution’s objection to the evidence. The majority overlooks the fact that the judge was able to view these exhibits, as well as consider the lack of foundational proffers by the moving party. The rationale for trial counsel’s objections, and for the military judge’s ruling—the lack of disclosure; the lack of logical relevance; the lack of reliability; the fact that the contested exhibits were in support of expert opinion and were created solely for the litigation in this case; and the failure to satisfy the reliability standards of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny—are evident on the record.
Without question, the defense has a constitutional right to introduce evidence that is both relevant and reliable. See United States v. Leiker, 37 MJ 418 (CMA 1993). As we said in United States v. Hayes, 36 MJ 361 (CMA 1993):
The Compulsory Process Clause, Chambers v. Mississippi 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and the Due Process Clause, Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), provide criminal defendants the right to introduce evidence and the right to examine defense witnesses at trial to allow “the jury ... [to] decide where the truth lies.” See Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). The extent of the right to present defense evidence is unsettled. Cf. Pennsylvania v. Ritchie, 480 U.S. at 56, 107 S.Ct. at 1000.
Id. at 362. Evidence that has “any tendency to make the existence of any fact ... more probable or less probable than it would be without the evidence” is logically relevant. Mil.R.Evid. 401, Manual for Courts-Martial, United States (2000 ed.);[1] United States v. Woolheater, 40 MJ 170, 172 (CMA 1994). Moreover, the same evidence must be legally relevant pursuant to Mil.R.Evid. 403. Id. “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of ... confusion of the issues ... or by considerations of undue delay....” Mil.R.Evid. 403.
The burden is on the proponent of evidence to show that it is both relevant and reliable by building a foundation for its admission or making an “offer of proof [that] allows the military judge to make an informed ruling and permits the appellate courts to review that ruling to determine whether exclusion of the evidence resulted in reversible error.” United States v. Means, 24 MJ 160, 162 (CMA 1987); Mil.R.Evid. *367 103(a), Manual, supra. No offer of proof is necessary when evidentiary relevance is obvious. Scientific or expert testimony is subject to the same evidentiary concerns of relevance and reliability. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Daubert, supra; see generally United States v. Houser, 36 MJ 392 (CMA), cert. denied, 510 U.S. 864, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993); Mil.R.Evid. 702, Manual, supra.
The majority finds that the military judge precluded the defense from fully presenting its case during a four-day trial on the merits. The record of trial shows otherwise. Regardless of our differing views of the evidence, the proper course of action—-and indeed the prevailing course of action in federal, state, and military courts—-is to return this record of trial to the Court of Criminal Appeals for factual findings underlying the military judge’s exclusion of four defense exhibits so that we can properly assess the military judge’s exercise of discretion. See Taylor v. Illinois, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); RCM 701(g), Manual, supra.
FACTS
At issue is whether the military judge abused his discretion in rejecting four defense exhibits that were to be used in conjunction with expert testimony. See Kumho Tire Co., supra; General Electric Co. v. Joiner, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).
Defense Exhibit TT for Identification (ID) is a one-page item entitled “Figure 6: Passenger Simulation.” It contains 25 picture frames that appear to demonstrate the motion of an unrestrained passenger inside a vehicle during a rollover accident and how that individual might be ejected Irom the vehicle. Defense Exhibit TT for ID was prepared as an overhead viewgraph to be used in conjunction with Defense Exhibit WW for ID during expert testimony.
Defense Exhibit UU for ID is two pages of handwritten notes that are unintelligible without further explanation. Defense Exhibit W for ID appears to be a printed graph entitled “EDSMAC Traj. Simulation.” The trial defense counsel made no proffer as to the relevance or reliability of these exhibits.
Defense Exhibit WW for ID is a ten-page document entitled “ATB Model Simulation of a Rollover Accident with Occupant Ejection,” authored by Huaining Cheng and Annette L. Rizer, Systems Research Labs, and Louise A. Obergefell, Department of the Air Force. This study involves a 1988 Toyota pickup truck and a 1979 Mercury car collision while both vehicles were moving in the same direction on a four-lane state highway. The paper is devoted to simulations of occupants in the Toyota pickup truck. As the majority opinion notes, the fatal accident in the case at hand involved a 1995 Jeep Wrangler with a fiberglass hardtop that was involved in a single car collision with a guardrail.
The military judge’s exclusion of the aforementioned defense exhibits for identification must be examined in the context of the case as a whole. When defense counsel attempted to enter Defense Exhibit RR (a scale drawing of the accident scene) into evidence, trial counsel objected to the use of this diagram based on the defense’s failure to provide this chart in a timely fashion prior to trial,[2] as well as the lack of reliability of the chart’s measurements. After argument, the military judge made the following ruling concerning the motion to exclude Defense Exhibit RR:
First of all, I believe the basis for the government’s objection are [sic] twofold. One is that the chart is based on unreliable information in that it’s old; and secondly, in that the defense has failed to comply with their discovery request in a timely manner.
And I agree with both. I agree that this chart is based on information that I don’t know if it’s adequate, and I don’t know if *368 it’s reliable, and I don’t think the government does either.
Secondly, this court has been set for a fairly lengthy period of time. Now, defense experts, like any other member of the defense team, are required to comply with discovery requests. They are required to comply with the rules of court. And in my view, that has not been done in this case. It’s been a sham.
At this time I’m not going to disqualify the chart because I think the chart goes to weight. I am going to give the government any delay they want in this ease to send their experts out to compare then-measurements with this chart, if they’re able to do that, so that they can come back and testify. That’s the only fair thing to do in this case. I am also going to let the government counsel cross-examine defense experts on why this chart arrived late and as to why there’s a delay in this case if there’s a delay that’s taken.
Following this ruling, trial counsel immediately complained about another matter of timeliness—that Defense Exhibit TT for ID had not been previously furnished to the Government. Defense counsel agreed that Defense Exhibit TT for ID was not furnished to government counsel until the third day of trial, May 28. Without further addressing the prosecution’s challenge to this exhibit, the military judge returned to the issue of Defense Exhibit RR and the length of time it would take the government experts to review the chart’s information in order to determine its accuracy, as well as relevance. Despite the Government’s argument that any delay would prejudice its ease, the military judge rejected trial counsel’s argument and said:
I’ll give you a couple-hour delay here and see if you can go out there and verify that information. I realize this puts you at a disadvantage, and I’m quite appalled at the way this discovery was handled. Quite appalled.
Again, I understand this soldier has a right to representation of counsel, and I’m concerned about that. But I’m also concerned that as a defense team, you’ve got to comply with the rules. And you’ve really ambushed the government in this case. They’re sitting here midway through their trial after a presentation of 21 or 22 witnesses, with a jury all set to listen to the defense side of the case, and you’ve put the court in a position where I either grant a delay for them to check stuff they should have been able to check before trial or I don’t let this evidence in, which I’m very inclined to do at this point.
MJ: Okay, well, now you understand why I’m taking this delay, right?
DC: Yes, Your Honor.
MJ: I’m taking this delay because you have not complied. Now, my other alternative is just to not allow this document in. I’m giving you a chance to comply so the government can be placed in a position of where they can at least cross-examine these witnesses and know where these figures came from. And, believe me, this is your last chance to do that.
Approximately two hours later, after investigation of the accident scene by Trooper Dolan (the government expert) and Mr. Smith (the defense expert), and over trial counsel’s objection that Defense Exhibit RR included marks on the road that no longer existed, the military judge allowed the exhibit to be used. Trial counsel also renewed his objection to Defense Exhibit RR based on a failure to comply with discovery. That too was overruled.
The military judge then turned to the admissibility of Defense Exhibits TT and WW for ID—the chart showing the kinetics of occupant movement in a rollover accident and the literature upon which that chart was based. The following then occurred:
MJ: Well, looking at the abstract in this, it talks about this being a simulation based upon a pickup truck; is that right?
DC: Your Honor, I believe the underlying accident that they modeled the study on involved a pickup truck, but I believe the study is more general than that.
*369 TC: Well, sir, I haven’t had a chance to read this thing. I gave it to Trooper Dolan to read. But, this, sir, is an exam-— you’ve allowed the defense to use Defense Exhibit RR. This is just outrageous that right in the middle of a very complicated trial, I get handed something else in mid-court that I have to read and prepare for. It’s outrageous. If you allow them to use this type of evidence, then they continue to do the same thing over and over again. There’s no incentive to comply with discovery.
MJ: I agree. The government’s objection is sustained. Moreover, looking at the document, I have read it. I question the relevance to this case anyway based on that. But I do agree with the government. I am sustaining the government’s objection. Please move on. Let’s call the members back.
Later in the trial, Mr. John J. Smith, the son of Raymond Smith, testified for the defense. He was qualified as an expert in the fields of accident reconstruction and bio-mechanics. Using Defense Exhibit RR, as well as information from law enforcement officers, medical personnel, and witnesses to the accident, Mr. Smith testified that Specialist (SPC) 0 was driving the vehicle and appellant was in the back seat. In reaching this conclusion, Mr. Smith opined that the police report showing “the first person being ejected before the vehicle ever started rolling” was in error. Mr. Smith continued:
... next, I looked at the three and a quarter rolls, and I was—I was suspicious because in real life, vehicles don’t roll three and a quarter rolls. In fact, some researchers say that only 6 percent of all rollovers—
TC: Objection, sir. This research has not been provided to the government.
MJ: Do you have that research, [defense counsel]?
DC: Yes, Your Honor, I believe we do have it available. I personally do not have it, but I believe Mr. Smith has brought it with him.
MJ: Why wasn’t it presented to the government?
DC: I was unaware that the government was interested in this research, Your Hon- or.
MJ: Well, there was a continuing discovery request, was there not?
DC: Your Honor, [trial counsel] was given the opportunity to interview Mr. Smith, and I was not made aware of any—
MJ: The objection’s overruled, but the data or literature will be provided to [trial counsel] this evening.
The witness went on to explain that only six percent of all vehicle rolls go even one- and-a-quarter rolls, and the Government’s evidence showing the vehicle rolled three- and-a-quarter times was definitely wrong. Mr. Smith bolstered this testimony by noting that there was no evidence that any part of the destroyed vehicle ever touched the pavement three times.
During direct examination, Mr. Smith forthrightly admitted that while he knew certain things about the accident based on available markings, there was not enough information to know exactly how the vehicle rolled. He concluded that appellant and Ms. N were backseat passengers because they were thrown the farthest and the greatest amount of propulsion energy would come from the back seat. He explained how SPC 0, whom he believed to be the driver of the vehicle, was likely thrown from the vehicle. Regarding Ms. D, Mr. Smith candidly admitted that he had “no mechanism to tie her to the right front, but by a process of elimination. ...” He knew that Ms. D was ejected, but exactly how, he could not determine. In particular, when explaining how Ms. D left the vehicle, Mr. Smith stated:
Full-scale simulations would indicate she probably went through the window. Based on tests that have been run, that’s the most likely place for her to go out, was the window. But, again, if the roof had been removed at that point—and it probably was—she could have gotten out there, also. She could have also gone through the roof.
*370 TC: Excuse me, sir. The government has not been aware of any tests that they’ve run, and we haven’t seen results of any tests. And that would also be part of our discovery request.
MJ: Do you have tests, [defense counsel], results of tests?
DC: No, Your Honor. The only test results I’m aware of the government provided to me.
TC: The witness just testified about test results. We have a discovery request in, and we have not received any test results.
MJ: Mr. Smith, do you have test results? Did you conduct tests?
WITNESS: No, Your Honor. What I was referring to are the full-scale tests that are published in the literature.
MJ: Okay, now, there’s been an objection to that, and that’s been sustained.
WITNESS: Oh, I’m sorry, sir.
MJ: The members of the court will disregard any testimony about literature about expulsion tests. Do you understand that? [affirmative responses from the court members]
MJ: Thank you. Please proceed, [further questions by the defense counsel:]
Q. Mr. Smith, did you run a computer simulation of this accident?
A. Yes, I did.
Q. Can you please explain to the members of the court what a computer simulation is.
TC: Sir, again, the government has not received any results of a computer simulation or anything.
MJ: Do you have those?
DC: Your Honor, again, Mr. Smith was available. He was interviewed by the government. He had whatever documents he has as a result of the simulation with him at the time of the interview.
TC: I disagree, sir. At the time the government interviewed Mr. Smith, he said he had not completed all his analysis. And that was the day before trial, last Monday.
MJ: Where are those?
WITNESS: Sir, one of the simulations is back there by my father.
MJ: Would you get it, please?
WITNESS: Yes, sir.
MJ: The court’s in recess in place.
[The court recessed at 1740 hours and reconvened at 1741 hours, 28 May 1998.]
MJ: The court is called to order. The objection to the simulation is sustained and to the testimony from that simulation,
[further questions by the defense counsel:]
Q. Mr. Smith, you testified earlier about calculating the maximum angle of rotation when the vehicle first entered the shoulder of the road.
A. Yes, sir.
Q. Could you—
TC: And, sir, those calculations were not provided to the government either.
MJ: Do you have calculations?
WITNESS: Yes, sir.
MJ: Where are they?
WITNESS: In my notebook, sir.
MJ: Go get them, please. The court’s in recess.
[The court recessed at 1743 hours and reconvened at 1744 hours, 28 May 1998.]
[Defense Exhibits UU and W for ID were marked and shown to the military judge.]
* ❖ ❖
MJ: ... The objection’s sustained. Move on, please.
TC: Sir, does that refer to the testimony, also?
MJ: That’s right.
[further questions by the defense counsel:]
Q. Mr. Smith, what is the track width of this vehicle?
TC: Again, sir, objection. The government has not been provided any diagrams that indicate how he measured the track width of the vehicle.
MJ: Overruled.
WITNESS: Seven point eight feet.
Q. In a rollover accident with unrestrained passengers, do the passengers move around within the vehicle?
A. Absolutely.
*371 Q. Do they move great distances, or could you please explain—
TC: Sir, at this time—-I believe that exhibit and the basis of study was excluded by the court. And if this witness is going to testify based upon that study, the government requests that he not be allowed to.
MJ: I’ll allow this question. Then move on to something else, please.
DC: Yes, Your Honor.
WITNESS: [Mr. Smith provided a detailed response.]
At the close of direct examination, trial counsel elected to begin his cross-examination the following day (May 29, 1998). The court opened at 8:11 a.m. on May 29, with more discovery contention:
TC: Sir, on Tuesday morning when I interviewed Mr. Smith, he tape recorded that conversation. Last night I asked the defense for a copy of that tape at 6 o’clock. I stayed until 9:30; I didn’t get the copy yet. My understanding is [defense counsel] came about 9:15, but I didn’t receive that tape till this morning before I came into court today. What I’d like to do is continue on with the cross-examination of Mr. Smith but then at least allow 15, 20 minutes to review that tape at some point.
MJ: Okay. Is there anything else to take up at this out-of-court session?
TC: No, sir.
DC: Your Honor, if I could just respond to that. I recall the request for the tape being closer to 7 o’clock, and I—
MJ: Well, let me interrupt you. I’m not worried about times. I’m just going to accommodate the government and let them listen to the tape.
DC: Fine, Your Honor.
MJ: You don’t have any problem with that, do you?
DC: No, Your Honor.
MJ: Okay. And, again, I don’t like finger-pointing. I know you guys are trying to do a good job, and you are doing a good job. But I just want to make sure that people get equal access. So, we’ll go ahead and conduct your cross-examination. At some point if you can do without it an hour, if you’re—I don’t know how long the cross-examination’s going to be. But at some point where we normally take a break, let’s take it then.
TC: Yes, sir. Thank you.
MJ: Okay?
DC: Fine, Your Honor.
MJ: All right. Please recall the members.
DISCUSSION
Our system of justice, like all others, has as its bedrock a single purpose—“that guilt shall not escape or innocence suffer.” Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); see United States v. Johnston, 41 MJ 13, 16 (CMA 1994)(“pur-pose of a trial is truthfinding within Constitutional, statutory, and ethical considerations”); see also Nix v. Whiteside, 475 U.S. 157, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986). “To this end, we have placed our confidence in the adversary system, entrusting to it the primary responsibility for developing relevant facts on which a determination of guilt or innocence can be made.” United States v. Nobles, 422 U.S. 225, 230, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), citing United States v. Nixon, 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), and Williams v. Florida, 399 U.S. 78, 82, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).
This case is about “adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent’s case.” Taylor, 484 U.S. at 411, 108 S.Ct. 646. More succinctly, it is about the right to present “competent, rehable ... exculpatory evidence!.]” Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). United States v. Scheffer, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), which reversed a decision of this Court, should be heeded. There, the Supreme Court held:
“[a] defendant’s right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions,” includ *372 ing the state’s “legitimate interest in ensuring that reliable evidence is presented,” and evidentiary exclusions will not violate the constitution “so long as they are not ‘arbitrary1 or ‘disproportionate to the purposes they are designed to serve.’ ”
DiBenedetto v. Hall, 272 F.3d 1, 8 (1st Cir. 2001), quoting Scheffer, supra at 308, 118 S.Ct. 1261, and Rock v. Arkansas, 483 U.S. 44, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).
In our system of open discovery, “[e]ach party shall have adequate opportunity to prepare its ease and equal opportunity to interview witnesses and inspect evidence.” RCM 701(e), supra. When one party unreasonably impedes the other party’s access to evidence or witnesses, RCM 701(g)(3) empowers the military judge to facilitate discovery, or as a last resort, exclude evidence that was not disclosed. The non-binding Discussion of the aforementioned Rule for Courts-Martial and Taylor, supra, make it clear that the sanction of excluding evidence is not the preferred method of dealing with a failure to comply with a discovery request or the procedural rules relating to discovery.
As the majority opinion notes, 57 MJ at 363, the narrow issue which we must decide is whether the military judge clearly abused his discretion by precluding appellant from introducing or using Defense Exhibits for ID TT through WW. Since these exhibits constituted “scientific, technical, or other specialized knowledge,” Mil.R.Evid. 702, supra, the military judge had a gatekeeping obligation to ensure, inter alia, that these exhibits were tied to the particular facts of this case. See Kumho Tire Co., supra. As the relevance of these exhibits is not obvious, defense counsel was required to establish their relevance and reliability to “assist the trier of fact to understand the evidence or to determine a fact in issue.” Mil.R.Evid. 702. Since the logical and legal relevance of these exhibits, as well as the reliability of the data therein, was not obvious on its face, the gatekeeper, the military judge, did not err if he sustained the Government’s objection to their admissibility on these grounds. As the gatekeeper, the military judge viewed the exhibits, knew by whom they were created and for what purpose, and properly looked to the proponent to establish their relevance and reliability.
A careful reading of the opinion of the Court of Criminal Appeals and the dissent thereto, as well as that of the majority of this Court, convinces me that this case is being decided on speculation, and not facts. The dissent below and the majority of this Court speculate that (a) the military judge excluded Defense Exhibits TT through WW for ID because trial defense counsel purposefully failed to comply with the Government’s discovery request,[3] and (b) defense counsel’s failure to turn over the exhibits at issue in a timely manner was somehow linked to the Government’s failure to provide timely and adequate funding for the defense experts. This may well be true, but there is insufficient evidence of record to substantiate such speculation.
I, too, could engage in speculation like the rhajority. The record of trial convinces me that the exclusion of Defense Exhibits TT and WW for ID was linked to those exhibits’ lack of relevance (how is scientific evidence of kinetic motion and ejection from a pickup truck during a two-car accident useful to the members in determining how passengers in a Jeep are ejected in a single car accident with rollover?). The exclusion of Defense Exhibits UU and W was based on their preparation for litigation and lack of reliability. But such speculation, to include conjecture about why the defense experts were evasive during pretrial interviews and why their exhibits were produced at the 11th hourj would be unfair to appellant. Simply put, there was no finding by the military judge that “the defense counsel’s failure to comply with [RCM 701] was willful and motivated by a desire to obtain a tactical advantage or to conceal a plan to present fabricated testimony.” RCM 701(g), Discussion.
*373 The sledgehammer approach, which the majority criticizes the military judge for using in this ease, but which the majority is quick to use themselves, is unnecessary. See United States v. Johnson, 970 F.2d 907, 912, 916 (D.C.Cir.1992) (remanding the case to the District Court to state the basis for its decision to exclude alibi witnesses and articulate its application of Taylor’s balancing test); cf. United States v. King, 222 F.3d 1280, 1283 n. 2 (10th Cir.2000)(where “the record from the district court’s proceedings ‘is insufficiently developed regarding the suppression issue’ to allow this court to resolve an appeal, a remand for further factual findings is the appropriate remedy”); United States v. Hurlich, 293 F.3d 1223 (10th Cir. 2002)(where a district court fails to provide adequate explanation for a particular sentence departure, remand for explanation is required unless an appellate court can unmistakably determine the reasonableness of the district court’s particular sentence); United States v. Novaton, 271 F.3d 968, 993 (11th Cir.2001)(when a record lacks certain trial exhibits, remand is required for district court to make factual findings as to whether any missing exhibits were relevant to defendant’s claim). As there are no on-the-record findings of fact concerning why these exhibits were not turned over to the Government in a timely fashion, the proper and only fair remedy is to return this record to a fact-finding body.
Finally, I disagree with what my colleague states explicitly in his concurring opinion, and what the majority implies—that the judge’s ruling “gut[ted] the defense theory of the case.” 57 MJ at 366. In this battle of medical and accident reconstruction experts, both sides had their respective day in court. This is not a case where the defense was denied the right to prove the identity of the perpetrator, nor denied the right to call a witness. See United States v. Valenzuela-Bernal, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); United States v. Roth, 52 MJ 187 (1999). The defense theory of the case, which was fully presented, was that appellant and Ms. N were in the back seat of the vehicle because: (a) they left the vehicle on a similar trajectory; (b) were thrown the greatest distance; and (c) the greatest amount of propulsion comes from the back seat of a vehicle. The members of the court chose not to believe this theory and found that appellant, whose blood alcohol content was .121 some 3-1/2 hours after the accident, was the driver. Absent further findings of fact, it is mere supposition to conclude that the exclusion of Defense Exhibits for ID TT through WW “gutted the defense case.”
With regard to trial counsel’s closing argument, I find no plain error. See United States v. Baker, 57 MJ 330, 337 (2002)(Crawford, C.J., dissenting)(discussing plain error analysis). Trial counsel’s initial closing argument covers a mere 15 pages in the record of trial. In that argument, trial counsel uses the word “ambush” on one occasion. There is no reference to the military judge’s ruling in connection with the use of that term, nor any objection by defense counsel. Trial counsel suggested Mr. Smith had not provided him with the documents underlying his testimony because Mr. Smith was unable to substantiate his views concerning who was sitting where in the vehicle at the time of the accident. In particular, trial counsel noted that Ms. Brown, a lay witness who found SPC O in the grass immediately after the accident at a location no one disputed, refuted Mr. Smith’s findings and calculations.
During the defense’s closing argument, which covers 16 pages in the record, there were three objections by trial counsel to statements by defense counsel. Two of these objections were to defense counsel arguing data or facts not in evidence and were sustained.
Trial counsel’s rebuttal argument, covering 15 pages in the record of trial, attacked the validity of Mr. John Smith’s conclusions. Contrary to the opinion of the majority and concurring judge, as well as the judge in the dissent below, trial counsel did not invite the court members to equate the military judge’s evidentiary rulings with the notion that the defense was somehow fabricating evidence and misleading the court. In particular, trial counsel argued:
*374 Who’s got the motive at that point to try to create evidence to substantiate their theory? It’s them. And how do we know that? It’s because you will receive the government’s request and motion to compel discovery. This case has been around for awhile. These experts had this case for a long time, and their analysis was not complete—at least, that’s what was told the government—until Monday night? Why? Why was it not complete until Monday night? He said he was busy; he was in court. Come on, this is a pretty serious case. He’s had it for a long time. It wasn’t completed. And you got to see here in court how many times I had to object because that was the first time I heard about this stuff. Objection sustained. Testimony not allowed. Why? Because he was trying to ambush, he’s trying to play fancy-free and footloose with this court-martial. He’s trying to pull the wool over your eyes. Did you accept his explanation of how it rolled? Did he tell you how he thought it rolled? Did he tell you what the damage was? No. He never gave you a clear answer.
And he talked about an interview that I had with him previously, and I asked him, “Did you tell me, ‘Do you want me to answer the questions you’re asking or the questions you should be asking?’ ” What does that tell you about that man? And what does it tell you about the ability to interview him, to try to get information out of him, and to try to pin him down? It tells you that he’s trying to cover something up because he doesn’t want to put his opinion on the line. There was no written report. Trooper Dolan had to write a report. They didn’t provide any written report to verify what they had to say. All these laws that he spouted out we’re just supposed to accept. He says it. “Ah. He’s an engineer. He attends these seminars. It’s got to be true.” Now, there’s no question he’s an engineer; he’s got qualifications I’ll never have. But he’s got to explain himself to you. And he didn’t.
Defense counsel’s sole objection during this argument, relating to trial counsel’s use of defense counsel’s opening statement, was overruled, but the court members were appropriately instructed. In short, trial counsel argued that Mr. Smith never produced any written reports, sat in court throughout the case, waited for Trooper Dolan to testify, and then tailored the defense testimony to ambush the government expert’s theory. In short, trial counsel argued that the defense had no answers, no legitimate conclusions, and came up empty-handed. Had the trial counsel argued in such a manner as my colleagues find, that would be error. However, the record speaks for itself, and trial counsel did not evoke the evidentiary rulings of the military judge in any manner that was either improper, unethical, or misleading.
CONCLUSION
I would return the record of trial to the United States Army Court of Criminal Appeals, consistent with Supreme Court rulings and the evidence of record, for further review. Accordingly, I respectfully dissent.

. All Manual provisions cited are identical to the ones in effect at the time of appellant’s court-martial.

. Defense counsel faxed a copy of this exhibit to trial counsel at 11:30 p.m. on the night before trial. The fax was sent to the legal assistance office, not trial counsel’s home. Trial counsel did not see the exhibit until the following day.

. I find no comfort in the majority's reliance on a lack of a Government argument concerning relevance on appeal. 57 MJ at 356-57 (n.5). Failure to argue an issue does not deter this Court from deciding a case based on that issue. Cf. United States v. Jordan, 57 MJ 236 (2002).