**UNITED STATES**

v.

**Prentice E. RATLIFF, 229 06 6896, Private (E–1), U.S. Marine Corps.**

**NMCM 91 01072.**

U.S. Navy–Marine Corps
Court of Criminal Appeals.

Sentence Adjudged 23 July 1990.

Decided 8 June 1995.

LT Peter Van Hartesveldt, JAGC, USNR, Appellate Defense Counsel, Maj. Steven P. Hammond, USMC, Appellate Defense Counsel.

LT Kevin S. Anderson, JAGC, USNR, Appellate Government Counsel, LT R.W. Sardegna, JAGC, USNR, Appellate Government Counsel.

Before MOLLISON, Senior Judge, and CLARK and DeCICCO, JJ.

CLARK, Judge:

A general court-martial consisting of officer and enlisted members convicted the appellant, contrary to his pleas, of conspiracy to commit robbery,[1] robbery by force and violence,[2] three specifications of assault with intent to commit robbery,[3] and false swearing.[4] The court-martial sentenced the appellant to confinement for 15 years, forfeiture of all pay and allowances, to pay a fine of $1,175.00, and a dishonorable discharge. The convening authority approved the sentence, but suspended for the duration of the appellant's confinement, plus one more year, confinement in excess of 10 years.

In this Court's initial review of this case, we set aside the convening authority's action and ordered that the case be returned for a new convening authority's action. The Court of Military Appeals (now The Court of Appeals for the Armed Forces) set aside this Court's decision and remanded the case for consideration in light of *United States v. Watson*, 37 M.J. 166 (C.M.A.1993).

The appellant has submitted five assignments of error.[5] We will address each in our discussion.

1. Uniform Code of Military Justice [UCMJ], art. 81, 10 U.S.C. § 881 (1988).

2. UCMJ, art. 122, 10 U.S.C. § 922 (1988).

3. UCMJ, art. 934, 10 U.S.C. § 934 (1988).

4. Id.

5. I. THE MILITARY JUDGE ERRED WHEN HE FAILED TO DIRECT THE CONVENING AUTHORITY TO GRANT TESTIMONIAL IMMUNITY TO TWO DEFENSE WITNESSES CRITICAL TO APPELLANT'S ALIBI DEFENSE.

II. THE MILITARY JUDGE ERRED WHEN HE ALLOWED INTO EVIDENCE AS A "STATEMENT OF A CO–CONSPIRATOR" A STATEMENT WHICH WAS NOT MADE DURING THE COURSE OF, OR IN FURTHERANCE OF, THE ALLEGED CONSPIRACY.

III. THE CONVENING AUTHORITY'S PURPORTED SUSPENSION OF 5 YEARS CONFINEMENT FOR AS MUCH AS 11 YEARS IS UNREASONABLY LONG, AND IS A NULLITY.

IV. THE COMMANDING GENERAL, MARINE CORPS BASE, CAMP LEJEUNE, WAS NOT IN THE CHAIN OF COMMAND EXTENDING TO THE COMMANDING GENERAL, 2D MARINE DIVISION, AND WAS NOT AUTHORIZED TO TAKE THE INITIAL ACTION IN APPELLANT'S CASE UNDER SECRETARIAL REGULATIONS.

V. A SENTENCE WHICH INCLUDES A FINE OF $1,175.00 IS INAPPROPRIATE WHERE THERE WAS LITTLE OR NO UNJUST ENRICHMENT BY APPELLANT, APPELLANT WAS ADJUDGED TOTAL FORFEITURES, AND THERE IS NO APPARENT ABILITY TO PAY THE FINE. [CITATIONS OMITTED]

## Factual Background

Private Smith, one of the appellant's co-conspirators, testified to the following scenario:

On 11 January 1990, Private Smith, Private Miller, Private First Class Bell, Lance Corporal Fowler, and the appellant decided that they needed money to go to Raleigh, North Carolina, during the "96" weekend they had been granted. After some drinking in their barracks at Camp Geiger, they agreed to rob some Marines from the School of Infantry to finance their trip.

They dressed to go to Rich's, a local club located in Jacksonville, North Carolina. Bell, Miller and Smith took sweat pants in addition to their dress pants; the others wore jeans. A Union cab took them to pick up Miller's car at Beacham apartments. They arrived at Rich's a little after midnight and left about 20 minutes later. When Bell said it was time to go they got into the car and returned to Camp Geiger where they parked at the back gate.

They squeezed through the back gate, walked past the construction site, where Miller and two others picked up sticks about 2 feet long. They spotted two individuals at the phone booths in the Quad area of 3/6 [quadrangle area surrounded by barracks housing personnel assigned to the third battalion of the sixth regiment of the Second Marine Division]. Smith and Miller attacked one of the individuals, hitting him and trying to get his wallet. The other three conspirators were attacking the other individual about 5 feet away. When Lance Corporal Copeland came out of the building carrying a long pole, Smith and Miller ran away and hid in the construction site. Two white males walked past them heading in the direction of Bell, Fowler and the appellant. Smith and Miller went to the car to wait. About 15 minutes later the three showed up at the car. Bell asked if they had seen the other two guys and said, "We tried to roll them and they put up a fight."

They returned to Rich's in Miller's car, but the club was closed. It was nearly 0200. They stopped at Scotchman's gas station on Bell Fork Road where they talked to a girl named Roshelda. They then went to the Burger King on highway 17, right next to Hardee's. They placed two orders at the drive-thru window. Bell had his wallet and the wallet they'd stolen, which contained two-hundred-and-something dollars. Afterwards they returned Miller's car to Beacham Apartments. Those wearing sweatpants took them off and they took the same Union cab back to Camp Geiger, arriving about 0300. MP cars and vans were at the barracks. Smith, Fowler and the appellant ran into the building through the back hatch; Bell and Miller talked to the MPs outside. The MPs had them come back outside to talk to them and to note what they were wearing.

He [Smith] has been sentenced to 20 years confinement for the robbery and assaults. His pretrial agreement limits his confinement to 5 years for his cooperation and testimony.

Lance Corporal Copeland testified that he recognized Smith and Miller as they ran past him after the attack on Lance Corporal Phillips. He also saw three people across the road alongside Weapons Company barracks. He did not immediately name Smith and Miller as the attackers he recognized because he didn't want to get involved.

Further corroborating testimony was presented from other witnesses:

First Lieutenant Resavy, weather service officer, testified that there was a 99% full moon, with scattered clouds at 20,000 feet, 7 miles visibility, with 99% illumination. It was a pretty nice evening.

Lance Corporal Phillips described being attacked by two individuals who struck him with a stick over the right eye, across the bridge of the nose, up beside his head and on the left knee, while trying to get his wallet. He knew they were "dark green",[6] but was not sure how they were dressed.

---

6. The term "dark green" is used to differentiate between Black or African–American Marines and "light green" or caucasian Marines. All of the

Lance Corporal Bender testified that he and Phillips were attacked by five or six black guys. They struck him with some kind of club on the right knee cap, the back, the shoulders, both legs, the right eye, and chest. One said, "Get him. Get his wallet." They shattered his glasses, which cost $120.00. The glasses cut him above the right eye. After taking his wallet, they hit him a couple more times then took off. He told the Naval Criminal Investigative Service Special Agent [NCIS-SA] that all the individuals wore cammies and covers; however, he was shaken up by the incident and doesn't really know what they were wearing. He knows the appellant from the company, but did not recognize him as one of the attackers that night.

Private Perry and Mr. Lake (formerly Private Lake) described being attacked by three or four black Marines (five or six according to Lake) while they were on their way back to the barracks, after entering the base through the back gate about 0200 to 0230. They were beaten with sticks and, after they ran away from their attackers, were pelted with rocks.

Special Agent Swanson testified to finding a "96 hour" liberty pass bearing the name of PFC Billy Bell adjacent to the crime area the next morning. Sgt Pittman, a police sergeant, testified to inspecting the area the preceding evening and finding no trash or paper. He said he would have noticed it. Special Agent Biller testified to taking a statement from the appellant wherein the appellant denied involvement of any of the suspects in the robbery and assaults.

The defense evidence consisted of alibi-type testimony from the taxi driver, two patrons at Rich's club, the Scotchman's manager, and the Burger King manager. The defense also presented Lance Corporal Fowler's previous testimony,[7] wherein he denied that there was a conspiracy, described what they were wearing, stated that they were all together that evening, and denied that any of them robbed or assaulted anyone.

I

Testimonial Immunity For
Defense Witnesses

The defense counsel presented a motion for the military judge to compel the government to issue grants of immunity to two prospective defense witnesses, Bell and Fowler. He proffered that the witnesses would testify that they had been with the appellant and two others all the evening of 12 January 1990 and that no one of the five of them had committed any robbery or assaults. These two witnesses were facing related charges, plus perjury charges for their earlier testimony. The assistant trial counsel and the defense counsel agreed that the witnesses would invoke their rights to remain silent if called to testify without immunity.[8] Without stating the factual basis for his ruling, the military judge denied the motion, but gave permission for the defense counsel to use the prior testimony of Bell and Fowler,

---

five conspirators were African–American Marines.

7. Lance Corporal Fowler's previous testimony at another proceeding served as a script which was presented to the court. The trial defense counsel read the questions and another officer read the answers.

8. Record at 112. This proffer is the only evidence that Bell and Fowler would invoke their rights to remain silent. The military judge did not inquire into whether the appellant understood his rights pertaining to stipulations in accordance with Rule for Courts–Martial [R.C.M.] 811(c) and agreed to the "stipulation". Nevertheless, since acceptance as a fact that Bell and Fowler would invoke their rights to remain silent inured to the appellant's benefit, we will treat the agreement between counsel as an offer of a stipu-

lation of fact. However, the military judge did not state his acceptance of the stipulation of this fact. Later he indicated his misgivings about Bell and Fowler being able to invoke a right to remain silent. Record at 116, 123, 124; cf. R.C.M. 811(e) (a stipulation of fact that has been accepted is binding on the court-martial). In initially deferring his ruling on the motion, the military judge indicated he would consider the defense's suggested "findings of fact" offered in Appellate Exhibit XXVI, the fourth finding being that Bell and Fowler would properly invoke their right to remain silent. Record at 134. Although the military judge engaged in considerable audible cerebrating on the motion, when he issued his ruling he made no essential findings. Record at 480; see R.C.M. 905(d).

as well as that of Miller, who had already been tried and convicted. Record at 480.

■ Where a defense request for a witness to be immunized has been denied, the military judge may grant appropriate relief upon finding that:

(1) The witness's testimony would be of such central importance to the defense case that it is essential to a fair trial; and

(2) The witness intends to invoke the right against self-incrimination to the extent permitted by law if called to testify. R.C.M. 704(e).[9]

This Court is somewhat hampered by the absence of essential findings on this motion, but we may examine the evidence presented to determine whether the military judge abused his discretion in denying the motion. *United States v. Spriddle,* 20 M.J. 804, *pet. denied,* 21 M.J. 314 (C.M.A.1985).

There was evidence that the witnesses intended to invoke their rights to remain silent if called to testify.[10] The military judge indicated his misgivings as to whether the law permitted them to remain silent where their testimony was non-incriminating. The proffer of their expected testimony did not establish that such testimony was incriminating. The defense had the burden of proving, by a preponderance of the evidence, that the expected testimony was of a nature which was protected by the right against compulsory self-incrimination. R.C.M. 905(c). The military judge's ruling indicated, implicitly, that he was not satisfied that this standard had been met. Considering the ambiguity of the proffer of evidence, we do not find that he abused his discretion in so ruling.

■ Even had the ruling been error, the appellant suffered no prejudice, because he was not denied the **use** of the exculpatory prior testimony. The military judge permitted the defense counsel to use the prior testimony of Bell, Fowler, and Miller. The prior testimony of Fowler was presented as a script enacted by the trial defense counsel

reading the questions and another officer reading the answers. Record at 487–551. This was an adequate substitute for the live testimony by Fowler. *See* R.C.M. 703(b)(3). The use of this testimony protected the appellant's due-process and fair-trial rights. *United States v. Zayas,* 24 M.J. 132 (C.M.A. 1987).

## II

### Statement By A Co-conspirator

■ Hearsay is not admissible except as provided by the Military Rules of Evidence [Mil.R.Evid.] or by any Act of Congress which applies in trial by courts-martial. Mil. R.Evid. 802. A statement is not hearsay if it is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy. Mil.R.Evid. 801(d)(2)(E). The military judge must decide whether a statement was made during the course of the conspiracy, which may mean determining when the conspiracy ended. STEPHEN A. SALTZBURG *et al,* Military Rules Of Evidence Manual 765 (3d ed. 1991). A conspiracy ends when its central criminal purposes have been attained. *United States v. Floyd,* 555 F.2d 45 (2d Cir.1977), *cert. denied, Floyd v. United States,* 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1977).

The object of the conspiracy in this case was to rob enough SOI Marines to get a couple hundred dollars to finance the conspirators' trip to Raleigh. Record at 214. Smith and Miller were unsuccessful in their attempt to take Phillips' wallet. Although Bell, Fowler, and the appellant had taken Bender's wallet containing a couple hundred dollars, it is obvious that they did not yet consider the criminal purposes of the conspiracy as having been attained, since they then tried to rob Perry and Lake. Having failed to get more money from Perry and Lake, Bell reported the status of the conspiracy to Smith and Miller. This status report could have been for the purpose of suggest-

---

9. This was the standard at the time of the appellant's trial. R.C.M. 704(e) has been amended since then creating a different standard.

10. This evidence did not come from the witnesses, but from representations to the defense counsel from the witnesses' defense counsel. Record at 112.

ing that they change their tactics to achieve their goal, that they reassess their situation before acting further, or that they "take the money and run." Either interpretation leads to the ineluctable conclusion that, up to the time Bell made the statement, the conspiracy was still ongoing. In the face of the frustrations they had encountered, the conspirators signalled their mutual agreement to discontinue the robberies by leaving the area. This marked the end of the conspiracy.

The military judge found that the statement related directly to the object of the conspiracy. Record at 240. Although perhaps inartfully stated, it is clear that the military judge found that the ends of the conspiracy had not been attained and that the statement was in furtherance of the conspiracy. The military judge analyzed the evidence in light of the policy intentions of the drafters of the military rules of evidence. This was reasonable, and his ruling was not error.

## III

### Suspension For Confinement Plus One Year

■ Suspension of the execution of a sentence shall be for a stated period or until the occurrence of an anticipated future event, and shall not be unreasonably long. R.C.M. 1108(d). The Secretary may further limit the period of suspension. *Id.* The Secretary of the Navy has not further limited the period of suspension, but in the applicable regulation has merely referred to the limitations in the applicable Rules for Courts–Martial. JAGINST 5800.7C, dated 3 October 1990, MANUAL OF THE JUDGE ADVOCATE GENERAL [JAGMAN], ¶ 0158c.

The Army's regulatory counterpart states that a "reasonable period of suspension" for a general court-martial is no more than two years or the period of any unexecuted portion of confinement. *United States v. Kinney,* 22 M.J. 872 (A.C.M.R.1986), *pet. denied,* 24 M.J. 58 (C.M.A.1987); *United States v. Snodgrass,* 22 M.J. 866 (A.C.M.R.1986), *pet. denied,* 24 M.J. 234 (C.M.A.1987) (both construing Army Regulation 27–10, 1 July 1984). Placing an appellant on probation for the entire period of his confinement is reasonable

as a control and motivating measure and is not violative of public policy or of R.C.M. 1108(d). *Id.*

The entire approved period of the appellant's confinement is 15 years. Placing him on probation for approximately 11 of those years is not unreasonably long.

## IV

### Improper Convening Authority Action

This issue has already been resolved adversely to the appellant's position. *United States v. Watson,* 37 M.J. 166 (C.M.A.1993).

## V

### Sentence Appropriateness

This Court does not find any aspect of the appellant's sentence to be inappropriate.

Accordingly, the findings of guilty and the sentence, as approved on review below, are affirmed.

Senior Judge MOLLISON and Judge DeCICCO concur.

MOLLISON, J., concurred prior to reassignment.

