**UNITED STATES**

v.

**Jahmal R. CLARK, Corporal (E–4), U.S. Marine Corps.**

**NMCCA 200300254.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 23 April 1999.

Decided 9 Aug. 2005.

Lt Michael Navarre, JAGC, USNR, Appellate Defense Counsel.

Maj Raymond Beal II, USMC, Appellate Government Counsel.

Before DORMAN, Chief Judge, PRICE, Senior Judge, and HARRIS, Appellate Military Judge.

PRICE, Senior Judge:

Contrary to his pleas, the appellant was convicted of conspiracy to commit arson, willful damage of non-military property, wrongful use of marijuana, aggravated arson, and assault with intent to commit arson. The appellant's offenses violated Articles 81, 109, 112a, 126, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 909, 912a, 926, and 934. A general court-martial composed of officer and enlisted members sentenced the appellant to confinement for 10 years, reduction to pay grade E–1, and a dishonorable discharge. The convening authority (CA) approved the sentence as adjudged, but deferred and waived automatic forfeitures as a matter of clemency.[1]

We have carefully considered the appellant's nine assignments of error,[2] the Govern-

---

1. This action did not benefit the appellant because he was on legal hold at the time of trial, and, thus, was not entitled to pay and allowances upon conviction. *See* Department of Defense Financial Management Regulation Volume 7A, § 010302G3.

2. I. THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO DISMISS WHERE APPELLANT'S IMMUNIZED STATEMENTS INFLUENCED THE GOVERNMENT'S PROSECUTION OF THE CASE AND PLEA NEGOTIATIONS

II. THE MILITARY JUDGE ERRED IN ADMITTING EXPERT TESTIMONY OF THE NAVY DRUG LAB EXPERT IN THE ABSENCE OF

ment's response, and the appellant's reply. Because of prejudicial post-trial delay and insufficient evidence of aggravated arson, we will grant partial relief as to the findings and the sentence. As modified, we conclude that the findings and sentence are correct in law and fact, and that no error materially prejudicial to the substantial rights of the appellant remains. Arts. 59(a) and 66(c), UCMJ, 10 USC §§ 859(a) and 866(c).

## Background

The appellant and his co-conspirators planned to burn their battalion command post building. Their motive was the destruction of a urine sample from Sergeant (Sgt) Dexter J. Daniels that was stored in the substance abuse control officer's (SACO) office in that building. Because he had been regularly using marijuana, Sgt Daniels feared that his sample would test positive for a controlled substance. He enlisted the appellant and Corporal (Cpl) Leroy B. Arellano II in the conspiracy. The appellant drove Sgt Daniels and Cpl Arellano to the scene, dropped them off, waited for them to set the fire, and then drove them away afterwards. The fire was extinguished before much of the building was damaged. Three watchstanders inside the building escaped serious injury.

Unharmed by the fire, Sgt Daniels' urine sample was tested at Navy Drug Screening Laboratory (NDSL), San Diego. It screened positive on the first and second immunoassay tests. The final test result by Gas Chromatography/Mass Spectrometry (GC/MS) was 13 nanograms/milliliter (ng/ml). Under Department of Defense regulations, this was considered a "negative" test result. Nevertheless, a chemist from the lab was allowed to testify over defense objection that the test result indicated that the sample donor had ingested marijuana and that the ingestion might have been with knowledge of the act and the identity of the marijuana. The military judge admitted this testimony during the Government's case-in-chief.

After the appellant was arraigned, the Government granted him testimonial immunity, intending to call him to testify in the prosecution against Sgt Daniels. After two interviews of the immunized appellant, the Government elected not to call him to the stand. Those two interviews were not reduced to writing, except in the form of notes taken by a legal clerk. The two trial counsel who participated in those interviews were later removed from participation in the appellant's case before the members were sworn.

## Admission of a "Negative" Urinalysis Result in Prosecution Case–in–Chief

The appellant contends that the military judge erred in admitting expert testimony that a "negative" urinalysis result indicated wrongful use of marijuana. We disagree.

The appellant relies on three arguments in support of his contention: (1) the admission of the expert testimony violated his due process rights; (2) the military judge permitted unreliable scientific evidence without conducting an evidentiary hearing; and (3) the "negative" urinalysis was an unreliable indicator of wrongful use of marijuana. We will address each argument in turn.

*Due Process and DODD 1010.1*

■ The due process argument is rooted in a purported violation of Department of Defense Directive (DODD) 1010.1 of 9 December 1994 (Change I, 11 January 1999), "Military Personnel Drug Abuse Testing Program." Under this and other directives,

EVIDENCE THAT A NEGATIVE URINALYSIS RESULT CAN PREDICT DRUG USE

III. CHARGE V'S SPECIFICATION OF AGGRAVATED ARSON IS MULTIPLICIOUS WITH CHARGE VI'S SPECIFICATION OF ASSAULT WITH INTENT TO COMMIT ARSON

IV. THE MILITARY JUDGE ERRED BY ADMITTING THE HEARSAY STATEMENTS OF A CO-CONSPIRATOR, MADE AFTER THE OBJECT OF THE CONSPIRACY HAD BEEN COMPLETED AND THEREFORE NOT IN FURTHERANCE OF THE CONSPIRACY

V. THE MILITARY JUDGE'S INSTRUCTION ON THE LAW OF CONSPIRACY AND TRIAL COUNSEL'S CLOSING ARGUMENT CONSTITUTED AN IMPROPER VARIANCE FROM THE CHARGE AS PREFERRED AND RESULTED IN UNFAIR SURPRISE TO APPELLANT

VI. THE CUMULATIVE ERRORS IN THIS CASE COMPEL REVERSAL OF THE FINDINGS

VII. UNCONSCIONABLE POST-TRIAL DELAY TOTALING 1392 DAYS PREJUDICED APPELLANT'S RIGHT TO EFFECTIVE POST-TRIAL REVIEW

VIII. APPELLANT WAS SUBJECTED TO CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 55, UCMJ, 10 USC § 855

IX. APPELLANT['S] SENTENCE INCLUDING A DISHONORABLE DISCHARGE AND TEN YEARS CONFINEMENT IS INAPPROPRIATELY SEVERE IN LIGHT OF HIS INVOLVEMENT IN THE ALLEGED CONSPIRACY AND HIS PRIOR HONORABLE SERVICE

as presented at trial, a urinalysis result of 15 ng/ml, or greater, for the marijuana metabolite is reported as "positive" and may be used in support of prosecution and adverse administrative actions. DODD 1010.1 at § 3.4.1; Department of Defense Instruction (DODI) 1010.16 at § E1.8 (9 Dec 1994). The appellant suggests that the directive prohibits the admission of "negative" urinalysis results except on rebuttal. We have searched the directive in vain for any such prohibition. The only specific provision referenced in the appellant's brief simply allows for results that fall below the cutoff to be used in rebuttal. DODD 1010.1 at § 3.4.3. We conclude that this provision does not limit the use of such "negative" results to rebuttal. We hold that the appellant has failed to carry his burden to demonstrate that he has been deprived of due process under this or any other directive.

In conjunction with this argument, the appellant also mistakenly relies on a decision of our superior court. In *United States v. Johnston*, 41 M.J. 13 (C.M.A.1994), the court held that the military judge did not abuse his discretion in excluding defense-proffered evidence of a negative urinalysis conducted three days after the last charged use of marijuana. We note that the decision is not on point, and that the court explicitly left for another day the issue "whether use by the Government of 'negative' test results in its case-in-chief would be barred by some other rule of law." *Id.* at 16. This court must now decide that issue.

It is significant that this is not a case where a "negative" urinalysis is offered to show that the appellant wrongfully used marijuana. In fact, it was not even offered to prove an essential element of any charged offense. Rather, it was offered to prove Sgt Daniels' motive for his actions, and by extension through the conspiracy, the appellant's motive for his role in the conspiracy and derivative offenses. Given the purpose and the context of the offer of this disputed evidence, we conclude that the directive does not provide the appellant with constitutional sanctuary.

*Daubert Hearing for "Negative" Urinalysis*

The appellant's second argument is based on the United States Supreme Court decision in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), where the Court emphasized the importance of a trial judge's evaluation of the reliability of expert scientific testimony. Essentially, the appellant now asserts that the military judge must always conduct a *Daubert* reliability hearing whenever such expert scientific testimony is proffered, whether the opponent attacks its reliability or not. That assertion carries little weight in light of *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), where the Court held that when expert testimony's "factual basis, data, principles, methods, or their application *are called sufficiently into question* ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of (the relevant) discipline.'" *Id.* at 149, 119 S.Ct. 1167 (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786)(emphasis added). Our scrutiny of the record reveals that, while the defense certainly complained about the admission of a "negative" urinalysis, it never attacked the factual basis, data, principles, methods, or their application, as embodied in the testimony of the expert witness.

Neither *Daubert* nor *Kumho Tire* require a trial judge to *sua sponte* hold a *Daubert* hearing every time scientific evidence is offered. *See United States v. Elmore,* 56 M.J. 533, 538 (N.M.Ct.Crim.App.2001). Here, no question as to the reliability of the scientific principles of urinalysis testing at the lab was raised. Moreover, we do not discern any dispute at trial regarding the chemist's evaluation of the test results. Therefore, we conclude that the military judge did not err in failing to hold a *Daubert* hearing.

*"Negative" Urinalysis and Wrongful Use*

Finally, the appellant contends that had the military judge conducted a *Daubert* hearing, he would have found that a "negative" urinalysis was an unreliable indicator of wrongful use of marijuana. However, the expert witness did not opine that the urinalysis result definitely indicated the wrongful

and knowing use of marijuana. Moreover, this contention overlooks the general nature of the Government's evidence.

The urinalysis result merely tended to corroborate more compelling prosecution evidence of the fact that Sgt Daniels had wrongfully used marijuana just before he provided his sample. Two witnesses testified that they socialized with Sgt Daniels and used marijuana with him many times.

Mr. Sean Kay, a former Marine, stated that he had seen Sgt Daniels use marijuana many times. He also explained that on the date of the urinalysis and fire, Sgt Daniels, Cpl Arellano and the appellant approached him and appeared to be nervous about the urinalysis. Sgt Daniels asked Mr. Kay about making a bomb. The conversation ended with Mr. Kay's suggestion that a fire might be an alternative to a bomb.

Mr. Raymond Fagan, another former Marine, testified that Sgt Daniels and the appellant introduced him to smoking marijuana. Mr. Fagan smoked marijuana with them regularly. On the date of the urinalysis, Sgt Daniels was worried and nervous. He said something to the appellant to the effect that he was worried about testing positive. Later that afternoon, Mr. Fagan heard Sgt Daniels say to the appellant, "I'm going to burn that m—f—down." Record at 567.

In addition, Mrs. Gina Swanson offered similar testimony. She knew Sgt Daniels through her husband, a co-worker of Sgt Daniels. At lunchtime on the date of the urinalysis and fire, Cpl Arellano told his wife and Mrs. Swanson that Sgt Daniels was very nervous about a surprise urinalysis and that they "were going to try to pull a Timothy McVeigh," which she understood to mean that they intended to blow up the command post. *Id.* at 617, 113 S.Ct. 2786.

We conclude that the military judge did not commit prejudicial error in allowing the Government to present this evidence of a "negative" urinalysis. We limit our holding to the facts of this case, including the purpose and context of the evidence.

**Use of Appellant's Immunized Statements**

The appellant argues that the military judge committed prejudicial error in denying his motion to dismiss all charges based on improper use of his oral immunized statements. The appellant specifically contends that his immunized statements impermissibly influenced (1) the Government's trial strategy, (2) the Government's position in plea negotiations, and (3) the Government's decision to continue with the appellant's prosecution. We disagree.

In a pretrial motion, the defense moved to dismiss all charges based on improper use of the immunized statements. The military judge heard testimony from several Government lawyers, including the staff judge advocate and multiple trial counsel. He then issued an interim ruling denying the motion. In that ruling, the military judge made detailed findings of fact and conclusions of law. He ordered the two original "tainted" trial counsel, who interviewed the appellant, to have no further contact with witnesses and no further discussions with the two new trial counsel. He also announced that before each Government witness testified on the merits, they would be interviewed in open court to determine whether they had any knowledge of the immunized statements. The military judge did so, questioning each Government witness in an Article 39(a), UCMJ, session before allowing testimony before the members. At the conclusion of the Government's case, the military judge concluded that none of the Government's evidence had been tainted. The trial defense counsel concurred. Record at 657–58.

Regarding the pertinent issues, our superior court has summarized the law on the use of immunized statements:

In *Kastigar v. United States,* ... the Supreme Court held that prosecutorial authorities may not use testimony compelled by a grant of immunity. We have construed "use" to include non-evidentiary use such as the decision to prosecute.... Other federal appellate courts have construed *Kastigar* to hold that the Government may not "alter its investigative strategy" based on immunized testimony....

Under *Kastigar,* the Government has a "heavy burden" to show non-use of immunized testimony.... Prosecution may proceed only "if the Government shows, by

a preponderance of the evidence, that the ... decision to prosecute was untainted by" immunized testimony.

*United States v. Mapes,* 59 M.J. 60, 67 (C.A.A.F.2003)(quoting *United States v. McGeeney,* 44 M.J. 418, 422–23 (C.A.A.F. 1996)). The Government bears the same burden to show, by a preponderance of the evidence, non-use as to trial strategy and plea negotiations. *Id.* Whether the Government has met that burden as to the various uses outlined above is a preliminary question of fact. We will not overturn the military judge's resolution of such factual matters unless his findings are clearly erroneous or are unsupported by the evidence. *Id.*

We have carefully considered the record of trial, particularly the evidence taken during litigation of the motion, and the findings and conclusions of the military judge. We conclude that the military judge's findings of fact are not clearly erroneous and are supported by the record.

The Government adequately insulated the new trial counsel and its witnesses at trial from the immunized statements and those who knew of those statements. We are confident that neither the Government's evidence nor its trial strategy was tainted by the immunized statements, either directly or indirectly.

Furthermore, we conclude that the decision to prosecute the appellant was not affected in any way by the immunized statements. Preferral, referral, and arraignment occurred several weeks before immunity was granted. After the immunized interviews were conducted, neither the staff judge advocate nor the CA became aware of the content of the immunized statements. The CA's decision to continue with prosecution against the appellant was not tainted by those statements.

Finally, we are convinced that the immunized statements did not affect the Government's position in plea negotiations. In fact, we conclude that the negotiations never commenced. The appellant's attorney was advised that if he wished to discuss a pretrial agreement, he should submit an offer in writing. He failed to do so. This assignment of error is without merit.

## Hearsay Statements of Co–Conspirator

The appellant asserts that the military judge committed prejudicial error by admitting out-of-court statements of Cpl Arellano through the testimony of Mrs. Gina Swanson. We agree that the military judge erred in concluding that the statements were admissible as statements of a co-conspirator in furtherance of the conspiracy, but hold that some of the statements were admissible under other theories. The remaining statements were indeed erroneously admitted. Despite the military judge's errors, the appellant suffered no material prejudice to any substantial right.

In a pretrial motion, the appellant asked the military judge to suppress all out-of-court statements of Cpl Arellano. The military judge deferred ruling on the motion. When Mrs. Swanson was called to testify as the Government's last witness on the merits, the military judge held an Article 39(a), UCMJ, session to rule on the admissibility of potential hearsay evidence.

The trial counsel first proffered that Mrs. Swanson would testify that on the date of the fire, she participated in two conversations with Cpl Arellano and Mrs. Arellano in their house. In the first conversation, Cpl Arellano mentioned the surprise urinalysis and announced that he and others were planning to "pull a Timothy McVeigh" on the building. Record at 604. In the second conversation, Cpl Arellano said that Sgt Daniels was coming over to work out the details of the plan. Soon, Sgt Daniels showed up, he and Cpl Arellano went outside, then Cpl Arellano came back inside and said, "If we pull this off, it will go down in history." *Id.* at 608. During the discussion of the foregoing proffer, the trial counsel referred to various exemptions and exceptions to the hearsay rule, including state of mind, residual hearsay, and admission by a co-conspirator.

It was the following proffer that the appellant now contends caused the prejudice:

TC: Later that night, sir, Mrs. Swanson is awakened by Mrs. Arellano. Mrs. Arellano is standing over her. I can't remember whether she says she was shaking her. But she was certainly standing over Mrs.

Swanson saying, "They did it. They did it." Our argument there is this is an excited utterance by Mrs. Arellano.

MJ: Sounds more like, They said they did it. They said they did it.

TC: Well, in which case it's in furtherance of the conspiracy anyway. He's home immediately trying to hide some of the—we're going to get to that later . . . .

When Gina Swanson goes outside, there's a—Arellano himself is bragging about the fact that's[sic] he's got some burned eyebrows. We would like to get that in; although, Gina Swanson says she looked intentionally to see if they were burned; and she couldn't see anything. So she continued to think it was a joke, so arguably affect [sic] upon a listener with respect to her.

And then the rest of this stuff we argue is in furtherance of the conspiracy. Arellano tosses to a neighbor a bag and says smell inside it. Actually tossed a black glove to a neighbor and says, Smell it. The neighbor says, "Smells like lighter fluid." Corporal Arellano says, "No Sh—." And then Arellano tells him to take it and keep it until this whole things [sic] dies off. All in furtherance of the conspiracy.

MJ: Captain Horse?

DC: I think that would be relevant if he was charged with obstruction of justice. I think the case law supports that once the conspiracy is done, it's done. Anything spilled over after that is basically irrelevant. What they are now trying to get into is things that happened afterwards. He isn't charged with obstruction of justice, and I don't think any of the three of them were.

MJ: *I'm pretty sure there's case law also that talks about efforts to conceal the conspiracy of the ultimate offense are in furtherance—or considered in furtherance of the conspiracy. I'll let that in to, too. I want—objections are overruled.*

*Id.* at 608–10 (emphasis added).

Mrs. Swanson's actual testimony was substantially consistent with the proffer. However, she *did not mention* observing whether Cpl Arellano was burned or singed. More-

over, she did not mention whether Cpl Arellano said anything in her presence about such injuries. Her only testimony on these points follows:

[TC]: When she said, They did it. They did it. What did you take that to mean?

[W]: Well, I wasn't really clear on what she was talking about. She just woke me up out of a good sleep and I wasn't quite sure. She just kept frantically saying, They did it. They did it.

She wanted me to come outside to see— Leroy Arellano said his eyelashes were singed and his face was, like, burnt.

*Id.* at 620. Although he had preserved the issue for the record, the trial defense counsel voiced another hearsay objection when Mrs. Swanson testified that Cpl Arellano asked the neighbor to smell the glove. The military judge overruled the objection without explanation.

■ Under MILITARY RULE OF EVIDENCE 801(d)(2)(E), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), a "statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy" may be admitted when offered against an accused. The military judge incorrectly stated that efforts to conceal the conspiracy are considered in furtherance of the conspiracy. Once the object of a conspiracy is accomplished, the conspiracy terminates and further statements by the conspirators may not be admitted under this rule. *United States v. Swan,* 45 M.J. 672, 676 (N.M.Ct.Crim.App.1996)(citing *United States v. Ratliff,* 42 M.J. 797, 801–02 (N.M.Ct.Crim. App.1995)). Thus, since the object of the conspiracy was arson, and the arson had been accomplished by the time Cpl Arellano returned to his house, the foregoing quoted statements were not admissible under MIL. R. EVID. 801(d)(2)(E).

However, that does not end our analysis. The trial counsel argued that Mrs. Arellano's exclamation "They did it!" was an excited utterance and therefore admissible under the hearsay exception contained in MIL. R. EVID. 803(2). The military judge indicated that he felt it was actually hearsay within hearsay, *i.e.,* Mrs. Arellano said that Cpl Arellano said that they did it. We conclude that the

military judge was correct, and that while Mrs. Arellano's statement was an excited utterance, Cpl Arellano's statement was inadmissible hearsay, thus rendering his wife's statement unreliable. We conclude that the military judge erred by allowing this testimony to go to the members.

Mrs. Swanson's testimony that Mrs. Arellano said that Cpl Arellano said that he was burned is also classic hearsay within hearsay. We are not convinced of its reliability and conclude that the military judge erred by allowing that testimony. As to the conversation about the smelly glove, the neighbor's comment is admissible as a present sense impression, MIL. R. EVID. 803(1), and Cpl Arellano's rejoinder is admissible as a statement of his mental condition, specifically, consciousness of guilt and his associated desire to conceal incriminating evidence. MIL. R. EVID. 803(3). The conversation about the smelly glove, the neighbor's comment, and Cpl Arellano's rejoinder are relevant to show that arson was committed and that one of the appellant's co-conspirators participated in the arson.

■ Finally, we conclude that the military judge's errors were harmless. Art. 59(a), UCMJ. The Government presented compelling evidence of the arson-related charges such that the appellant could have easily been convicted if Mrs. Swanson had not been allowed to offer the testimony in question. We decline to grant relief.

### Sufficiency of Evidence of Aggravated Arson

■ Although not raised as an assignment of error, we conclude that the evidence is factually insufficient to support the conviction of aggravated arson. However, we conclude that the evidence is sufficient to support a conviction of the lesser included offense of simple arson.

To obtain a conviction under Article 126, UCMJ, for aggravated arson of a structure (Charge V),[3] the Government must establish

the following five elements beyond a reasonable doubt:

(1) That the [service member] burned or set on fire a certain structure;

(2) That the [service member's] act was willful and malicious;

(3) That there was a human being in the structure at the time;

(4) That the [service member] knew that there was a human being in the structure at the time; and

(5) That this structure belonged to a certain person and was of a certain value.

MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.), Part IV, ¶ 52b(1)(b). Simple arson is the willful and malicious burning or setting fire to the real or personal property of another person, i.e., human or other legal entity, under circumstances not amounting to aggravated arson. Id. at ¶ 52c(3). For aggravated arson of a structure, it is essential that the Government prove that the offending service member knew that there was a human being inside at the time, id. at ¶ 52c(2)(b), because danger to human life is the essential element. Id. at ¶ 52c(1).

Although the Government offered circumstantial evidence that the appellant knew that watchstanders would be inside the building when his co-conspirators set the fire, we are not satisfied that such knowledge was proved beyond a reasonable doubt. Undoubtedly, that is why the trial counsel acknowledged the weakness of the Government's evidence on this point in his argument on the merits. Record at 726. Thus, we cannot affirm the findings of guilty of aggravated arson. Art. 66(c), UCMJ. However, we will affirm a finding of guilty of the lesser included offense of simple arson.

### Multiplicity

In view of the foregoing, the appellant's assignment of error relative to multiplicity of aggravated arson and assault with intent to commit arson is moot. Moreover, we conclude that, based on the facts of this case, simple arson is not multiplicious with assault with intent to commit arson.

---

**3.** Upon the dismissal of Charge II (Article 108, UCMJ), the charges were renumbered. We will use the original numbering of the charges.

## Sufficiency of Evidence of Assault With Intent to Commit Arson

 Although not raised as an assignment of error, we will briefly discuss the offense of assault with intent to commit arson.[4] Charge VI and its sole Specification allege that the appellant:

with the intent to commit arson, commit[ted] an assault upon Staff Sergeant Roosevelt L. Howard, U.S. Marine Corps, Lance Corporal Mark A. Moore, U.S. Marine Corps, and Lance Corporal Shawn Johnson, U.S. Marine Corps, by setting fire to building # 14131, the 7th Engineer Support Battalion (7th ESB) command post.

Charge Sheet.

As indicated by the specification, there were three Marines inside the building standing duty at the time of the fire. The Government offered evidence of injury to only one of the three, LCpl Johnson. He testified that, after he made some rounds at about 2300, he turned in for the night. He was allowed to do so because he had a sleeping post. He slept in a room about 20 feet from the SACO's office. A few hours later, LCpl Johnson woke up gagging for air. He was choking on smoke from the fire set by Sgt Daniels and Cpl Arellano.

The Government's proof did not establish that the co-conspirators intended to injure anyone inside the building. Nor, did the Government show that any of the three Marines inside the building apprehended any immediate bodily harm.

The elements of the offense of assault with intent to commit arson are:

(1) That the [service member] assaulted a certain person [or persons];

(2) That, at the time of the assault [or assaults, the service member] intended to ... commit ... arson ...; and

(3) That, under the circumstances, the conduct of the accused [service member] was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

MCM, Part IV, ¶ 64b. Like any charge of assault, to prove this offense, we hold that the Government may offer evidence under theories of attempt, offer, or battery. We conclude that theories of attempt and offer are not borne out by the Government's proof. But, we conclude that the evidence is legally and factually sufficient to support a conviction of this offense based upon a theory of battery through culpable negligence. In other words, when the appellant's co-conspirators started the fire, they demonstrated a gross, reckless, wanton, and deliberate disregard for the foreseeable results of that fire relative to other human beings. However, based on our review of the record, we find that the only Marine who suffered any injury as a result of the fire was Cpl Johnson. Accordingly, we will except SSgt Howard and LCpl Moore from the findings of guilty.

## Post–Trial Delay

The appellant contends that unconscionable post-trial delay totaling 1392 days prejudiced his right to effective post-trial review. Based on our review of the 788–page record and allied papers, we agree.

We summarize the post-trial processing of this case as follows:

| | |
|---|---|
| 23 Apr 99 | Sentence adjudged. |
| 13 Jan 00 | Record authenticated. |
| 08 Mar 00 | Clemency petition # 1 submitted. |
| 15 Jun 00 | Clemency petition # 2 submitted (referenced in Government brief but not included in the record). |
| 06 Sep 00 | Clemency petition # 3 submitted, including complaint of post-trial delay. |
| 03 Oct 00 | Staff Judge Advocate's Recommendation (SJAR) completed, with no explanation for post-trial delay (**17.5 months** from sentencing). |

---

4. We note that this offense is rarely prosecuted. The offense is specifically listed in Paragraph 64 of the Manual for Courts–Martial, but there is no explanation provided. Moreover, we have searched for any reported appellate decision addressing and explaining the offense, to no avail.

06 Oct 00 Defense response to SJAR, implicitly complaining of post-trial delay.

30 Oct 00 CA Action, with no explanation for post-trial delay (**18 months** from sentencing).

12 Mar 01 Record placed in certified mail to Navy–Marine Corps Appellate Review Activity (NAMARA)(**4.5 months** from CA Action).

20 Apr 01 Damaged record received by NAMARA. Volumes 1–3 missing. NAMARA makes repeated efforts to obtain complete record.

18 Nov 02 Appellant writes from the United States Disciplinary Barracks to NAMARA asking for assignment of appellate counsel, noting it has been two years since CA Action.

13 Feb 03 Record received at NAMARA.

10 Mar 03 Record docketed (nearly **4 years** since sentencing).

■ We consider four factors in determining if post-trial delay violates the appellant's due process rights: (1) the length of the delay, (2) the reasons for the delay, (3) the appellant's assertion of the right to a timely appeal, and (4) prejudice to the appellant. *United States v. Jones,* 61 M.J. 80, 83 (C.A.A.F.2005)(citing *Toohey v. United States,* 60 M.J. 100, 102 (C.A.A.F.2004)). If the length of the delay itself is not unreasonable, there is no need for further inquiry. If, however, we conclude that the length of the delay is "facially unreasonable," we must balance the length of the delay with the other three factors. *Id.* Moreover, in extreme cases, the delay itself may "give rise to a strong presumption of evidentiary prejudice." *Id.* (quoting *Toohey,* 60 M.J. at 102).

■ Here, there was unexplained delay of about 18 months from the date of sentencing to the date of the CA's action. There was also a delay of nearly four years from the date of sentence to docketing at this court. We find that the delay alone is facially unreasonable, triggering a due process review. Since there are no satisfactory explanations in the record, particularly as to the delay from trial until CA's action, we look to the third and fourth factors. The appellant repeatedly complained about the delay, both before and after the CA's action. He also complains that he was prejudiced because, due to the tardy docketing of the record, his appellate defense counsel was delayed in filing an appeal, which, in this case happened to prove meritorious, in part. Moreover, we find that the poor legibility of parts of the record and the time required to locate and attach various allied papers further prevented his appellate defense counsel from timely and effective review of the record and preparation of an appeal.

■ We conclude that the appellant suffered actual prejudice due to the Government's sloppy and dilatory processing of this record. "Balancing the four factors, we hold that the post-trial delay violated appellant's due process rights. The same evidence that supports the due process test's prejudice factor also demonstrates prejudice for purposes of Article 59(a), UCMJ." *Id.* at 85–86.

In considering appropriate relief, we note that the appellant stands convicted of extremely serious charges, a factor that dissuades us from setting aside the findings or the punitive discharge. However, substantial relief is warranted as to confinement and the nature of the punitive discharge.

### Conclusion

We have considered the remaining assignments of error and find them lacking in merit. The finding of guilty of aggravated arson under Charge V is set aside. We except the words, "knowing that a human being was therein at the time," from the specification under Charge V. That language is dismissed. A finding of guilty of the lesser included offense of simple arson under Charge V is affirmed. Further, we except the words, "Staff Sergeant Roosevelt L. Howard, U.S. Marine Corps, Lance Corporal Mark A. Moore, U.S. Marine Corps, and" from the specification under Charge VI.

That language is also dismissed. We affirm the remaining findings.

We have reassessed the sentence in accordance with *United States v. Cook,* 48 M.J. 434, 438 (C.A.A.F.1998). We affirm only so much of the sentence extending to confinement for six years, reduction to pay grade E–1, and a bad-conduct discharge. As reassessed, we conclude that the sentence is appropriate and that the sentence is no greater than that which would have been imposed and approved if the prejudicial errors had not been committed.

Chief Judge DORMAN and Judge HARRIS concur.

Judge HARRIS participated in this decision prior to detaching from the court.